### STATE OF CONNECTICUT *v.* DARRYL WHITAKER
### (12742)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CIOFFI, Js.

Argued November 12, 1986—decision released February 10, 1987

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Henry J. Lyons II,* assistant state's attorney, for the appellee (state).

DANNEHY, J. The defendant, Darryl Whitaker, was found guilty by a jury of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), attempted murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), sexual assault in the first degree in violation of General Statutes § 53a-70 (a), robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), and assault in the first degree in violation of General Statutes § 53a-59 (a) (1). He was sentenced to consecutive terms of twenty-five years on the charge of kidnapping, twenty years on the charge of attempted murder, twenty years on the charge of sexual assault, ten years on the charge of robbery, and a concurrent term of ten years on the charge of assault, for a total effective sentence of seventy-five years.

On appeal, the defendant contends that the trial court erred (1) in summarily quashing a subpoena, (2) in ordering the defendant to produce statements of certain alibi witnesses, and (3) in imposing a total effective sentence greater than that which could be imposed for murder. Though finding no error on the third issue, we agree that the trial court erred in quashing the subpoena and in ordering the production of the witnesses' statements. We therefore reverse this case and remand it for a new trial.

A review of the evidence adduced at trial reveals that on February 8, 1983, at about 2:30 p.m., the victim left her apartment and walked to a bus stop in front of Cen-

tral High School in Bridgeport. She intended to take a bus downtown to pay an electric bill and carried $120 in her purse for that purpose. While she was awaiting the bus, a light-skinned black man approached her and asked where she was heading. The man was directly facing her when he asked the question, and was wearing a green army coat, gray dress pants and a beige and blue sock hat. When she replied "downtown," the man said he had a gun in his pocket, and if she screamed or tried to run away he would shoot her. He displayed what looked like a gun, ordered her to walk a short distance with him and told her he would take her money and let her go. The victim offered her pocketbook to the man, telling him to "[t]ake it and just go." The man then grabbed her arm and dragged her across the school parking lot, through a hole in a fence and down a hill. Several times he threatened her and displayed what appeared to be a gun.

The man took the money in the victim's purse and ordered her to take off her clothes. When she refused and started to cry, he told her to "shut up." He then struck her in the mouth, removed her coat and pants, and pushed her to the ground as she struggled. He then sexually assaulted her. After the sexual assault, he told her that he could not release her because she could identify him. He began to strangle her, first with his hands and then with a piece of wire which he had removed from his pocket. Eventually, the victim lost consciousness. She awakened to find herself under the steps of the school's stadium, her face lying in a pool of blood. She could not see out of one eye and injuries to her entire face caused her great pain. She managed to crawl to the school's parking lot, where a passerby summoned an ambulance. It was later determined that the victim had been beaten in the face with two boulders. Testimony heard by the jury also revealed that as a result of the injuries, she had required extensive surgery on her jaw and eye.

While confined to a hospital undergoing intensive care, the victim was shown a number of police photographs. The victim identified one of the photographs, a picture of the defendant, as portraying her assailant. On February 9, 1983, the police searched the defendant's home pursuant to a warrant and seized some wire, a hat, coat and pants resembling those described by the victim, and a replica of a .45 Colt automatic.

## I

### PROSECUTORIAL DISCOVERY

We will first address the defendant's claim of error wherein he asserts that the trial court erred in ordering the production of certain statements made by defense witnesses to his investigator. This issue arose at trial while the defendant was presenting evidence of an alibi defense. The defendant testified that on the afternoon of February 8, 1983, he had boarded city bus No. 12 at the Trumbull Shopping Park at about 2:35 p.m. About ten to fifteen minutes later, he claims, he got off the bus and walked to his home in Bridgeport. According to the defendant, he remained at home for the rest of the afternoon.

Various defense witnesses were called to verify the defendant's explanation of his whereabouts on the afternoon in question. One witness, Marion Johnson, testified that she was a friend of the mother of the defendant's girlfriend. She claimed that she had seen the defendant on bus No. 12 at approximately 2:40 p.m. on February 8, 1983. According to Johnson, the defendant got off the bus near his home in Bridgeport. On recross-examination, she was asked whether she had given a written statement to anyone from the office of the defendant's attorney. Defense counsel objected, and a hearing occurred outside the presence of the jury. The state argued that it was entitled to such a statement if it existed. The defendant maintained that nei-

ther the Practice Book nor the federal or state constitution requires a defendant to produce such statements. The court overruled the objection and ordered the defendant to produce the witness's statement. Apparently these statements did not contain any relevant evidence to impeach the witness, as the remainder of the cross-examination was uneventful.

When the same situation occurred during the testimony of another witness, however, the statement that the defendant was ordered to produce did in fact contain relevant impeaching information. Delores Jackson, the driver of bus No. 12, testified that the defendant was on board her bus when it departed from the Trumbull Shopping Park at about 2:30 p.m. on February 8, 1983. She stated that he got off the bus about five to six minutes later near Old Towne Road in Bridgeport. Jackson was asked on cross-examination if she had given a statement to anyone regarding this subject. When she replied that she had spoken to a defense investigator and that he had tape recorded her statement, the prosecutor requested access to the tape. The defendant objected again and argued that the statement did not have to be produced. His objection was overruled. The trial court ordered production of the tape, stating to defense counsel "why shouldn't you have to produce it just as [the prosecutor] has to produce any statement of any witness that he . . . has taken? . . . I think that rule extends both ways."[1]

---

[1] The pertinent portion of the cross-examination by the state is as follows:

"Q. Mrs. Jackson, did you give a written statement to anybody concerning this matter?

"A. I didn't give anyone a written statement. An investigator spoke with me on the bus and he tape-recorded what I said.

"Mr. Lyons: May I have that tape-recorder and have it so I may be able to see what's on there, if Your Honor please?

"Mr. Ruane: May the jury be excused, Your Honor?

"The Court: Ladies and gentlemen of the jury, I will ask you to retire. (Whereupon the jury was excused at 10:55 a.m.)

"Mr. Ruane: I move for a dismissal. The State knows that's not produce-

The tape recorded conversation between the investigator and Jackson revealed that Jackson had been shown a picture of the defendant and that she had been unable to identify the male in the photograph as the person she had seen on her bus. The state confronted Jackson with this fact on cross-examination. Although Jackson later positively identified the defendant in court as the man on the bus, the state pointed out that the statement made to the investigator was taken shortly after the incident in question. Moreover, during his closing argument, the prosecutor again referred to Jackson's failure to identify the defendant's photograph.

The defendant contends that the trial court's order violated the Practice Book, article first, § 8, of the Connecticut constitution,[2] the state and federal guarantees of effective assistance of counsel, and the work product doctrine. He claims that this sort of mutual discovery in criminal cases has never been allowed in Connecticut and that traditionally, the state does not

able. There's nothing in the Practice Book. There's nothing in the Connecticut General Statutes and there's nothing in the Constitution that requires an attorney's work product to be given to the State. And to say that in front of the jury, demands that I ask and Your Honor grant a motion to dismiss this case. So I make that motion at this time.

"Mr. Lyons: It's no different than the statement given by Mrs. Johnson which Your Honor allowed in evidence.

"The Court: Motion denied.

"Mr. Ruane: May I have an exception?

"The Court: Exception noted.

"Mr. Ruane: I ask Your Honor to declare a mistrial on the same grounds.

"The Court: If it's a statement that was given by the witness, why shouldn't you have to produce it just as he has to produce any statement of any witness that he—that he has taken? After the witness testifies, he is required to produce that statement. Why aren't you?

"Mr. Ruane: Because there's no law that gives him the power to ask for it or demand that I give it to him.

"The Court: I think that rule extends both ways."

[2] Article first, § 8, of the Connecticut Constitution, provides in part: "No person shall be compelled to give evidence against himself . . . ."

have the power "to probe the files of defense counsel." See *State* v. *Cocheo,* 1 Conn. Cir. Ct. 610, 614, 190 A.2d 916 (1963). We agree with the defendant that the trial court should not have ordered the production of the statements of either witness. Our holding is based on the general structure of the Practice Book's discovery provisions and on specific language contained in §§ 752 and 763. We find it unnecessary, therefore, to decide whether the court's ruling also violated the state and federal constitutions or the work product doctrine.

Chapter 26 of our Practice Book regulates discovery in criminal proceedings. Sections 740 through 747 relate specifically to disclosure of information by the *prosecution.* Under these provisions, the defendant is allowed access to a wide range of information in the possession of the state. Certain types of information are discoverable by the defendant as a matter of right; see Practice Book § 741; other types are discoverable at the trial court's discretion; see Practice Book §§ 743, 744; and some material is simply not discoverable under the rules at all. See Practice Book § 746. Under one provision, entitled "Additional Disclosure," the court may order disclosure to the defendant of other information not covered by the rules as the interests of justice may require. See Practice Book § 745.

The rules governing disclosure of statements of a witness are found in §§ 751 through 755. After a *state's* witness has testified on direct examination, § 752 provides that on the defendant's motion the court "shall . . . order the state to produce any statement of the witness in the possession of the state or its agents . . . which . . . relates to the subject matter about which the witness has testified." See also General Statutes § 54-86b. By its plain wording this provision applies only to statements made by *prosecution* witnesses; it clearly does not allow for disclosure of statements made

by *defense* witnesses. The trial court's order in this case to produce statements made by the two alibi witnesses, therefore, cannot be sustained under this provision.

It has been recognized that discovery is not a "one-way street"; see *United States* v. *Nobles*, 422 U.S. 225, 233, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975); and that some degree of mutual discovery is essential to the truth-seeking process. Our Practice Book provisions relating to defense disclosure, however, are of a more limited nature than the prosecutorial disclosure provisions. They relate mainly to certain defenses, such as alibi or mental disease or defect, upon which the defendant intends to rely at trial. See Practice Book §§ 756 through 768. The alibi provisions only require the defendant to file a notice of his intention to rely on the alibi defense and to "state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the *names* and *addresses* of witnesses upon whom he intends to rely to establish such alibi." (Emphasis added.) Practice Book § 763. Significantly, this section does not mention disclosure of *statements* made by an alibi witness. Thus, the court's order requiring disclosure of the statements made by the defendant's alibi witnesses cannot be justified under the Practice Book provisions relating to the alibi defense.

Finally, the provisions contain no section analogous to § 745 which would allow the disclosure to the prosecution of additional information if the trial court deemed disclosure to be in the interests of justice. In short, our rules of practice neither explicitly nor implicitly support the trial court's conclusion that disclosure of a witness's statement "extends both ways."

A number of courts facing prosecutorial discovery issues like the one at bar have declined to adopt a rule of mutual disclosure of witness statements in the

absence of some previous authorization by statute or rule of practice. See, e.g., *Moore* v. *State,* 105 Ariz. 510, 513, 467 P.2d 904 (1970); *Richardson* v. *District Court,* 632 P.2d 595, 599 (Colo. 1981); *Middleton* v. *United States,* 401 A.2d 109, 115 (D.C. App. 1979); *State* v. *Sandstrom,* 225 Kan. 717, 728, 595 P.2d 324, cert. denied, 444 U.S. 942, 100 S. Ct. 296, 62 L. Ed. 2d 308 (1979); see generally annot., 23 A.L.R.4th 799. These courts point out that underlying the imbalance between prosecutorial and defense discovery are constitutional and general societal concerns. In *Middleton* v. *United States,* supra, 116 n.11, the court explained that criminal discovery is strongly influenced by concerns that "the accused be secure from condemnations resting upon his coerced testimony or the improper annexation of his counsel's labors, and that the safety of the community not be jeopardized by unrestrained access to its prosecutor's files. These concerns, as well as proper deference to the constitutional principles which burden the state alone with proof of criminal charges, and considerations of fairness in light of the normal superiority of the government's investigatory resources, necessarily will frustrate the evolution of a parity of access similar to that embodied in the rules applicable to civil proceedings."

We recognize that some jurisdictions, as well as the federal rules of criminal procedure, allow for mutual disclosure of witness statements. See Fed. R. Crim. P. 26.2; *State* v. *Montague,* 55 N.J. 387, 399, 262 A.2d 398 (1970); *State* v. *Nelson,* 14 Wash. App. 658, 664, 545 P.2d 36 (1975); see generally annot., 23 A.L.R.4th 799. Nevertheless, we agree with the *Middleton* court that "[h]owever appealing the notion of full disclosure may be in the abstract, important constitutional and societal interests affected by the criminal discovery process counsel against casual acceptance of such a major revision of the established statutory schemes." *Middleton* v. *United States,* supra, 121.

The trial court's order allowing access to the statements of the defense witnesses in this case cannot be considered harmless. The statement made by Delores Jackson ' to the investigator contained information which the state used to impeach her credibility. Jackson was a crucial alibi witness because unlike the other alibi witnesses,[3] she had no ties to the defendant and arguably no reason to lie on his behalf. The jury could reasonably have discredited the defendant's alibi because of the information erroneously ordered disclosed by the trial court. A new trial is therefore required.

## II

### MOTION TO QUASH

Although our finding of error requires us to order a new trial, we will also consider one of the remaining issues raised by the defendant, as it is likely to arise on retrial of this matter. *State* v. *Keiser,* 196 Conn. 122, 131, 491 A.2d 382 (1985). The defendant's second contention on appeal involves the quashing of a subpoena duces tecum which the defendant had served on the coordinator of the YWCA rape crisis service in Bridgeport. The subpoena commanded the coordinator to appear in court on January 25, 1985, and to bring with her any records concerning the victim. On the designated day, counsel appeared for the coordinator and filed a motion to quash based on General Statutes § 52-146k.[4] Under the provisions of that statute, com-

---

[3] The defendant's mother testified that the defendant arrived home at approximately 2:40 p.m. on February 8, 1983. As stated earlier, Marion Johnson, the friend of the mother of the defendant's girlfriend, testified that the defendant got off bus No. 12 in Bridgeport at approximately 2:40 p.m.

[4] "[General Statutes (Rev. to 1985)] Sec. 52-146k. PRIVILEGED COMMUNICATIONS BETWEEN BATTERED WOMEN'S OR SEXUAL ASSAULT COUNSELOR AND VICTIM. (a) As used in this section . . . (5) 'Sexual assault counselor' means any person engaged in a rape crisis center who (A) has undergone a minimum of twenty hours of training which shall include, but not be limited to, the dynamics of sexual assault and incest, crisis intervention, commu-

munications between a "sexual assault counselor" and a "victim" are confidential and may not be disclosed absent a waiver by the victim. The motion to quash alleged that the coordinator was a "sexual assault coun-

nication skills, working with diverse populations, an overview of the state criminal justice system, information about hospital and medical systems and information about state and community resources for sexual assault victims, (B) is certified as a counselor by the sexual assault center which has provided such training, (C) is under the control of a direct services supervisor of a rape crisis center, and (D) whose primary purpose is the rendering of advice, counseling and assistance to, and the advocacy of the cause of, victims of sexual assault.

"(6) 'victim' means any person who consults a battered women's counselor or a sexual assault counselor for the purpose of securing advice, counseling or assistance concerning a mental, physical or emotional condition caused by a battering or a sexual assault.

"(b) A battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidential communications waives the privilege, provided under no circumstances shall the location of the battered women's center or rape crisis center or the identity of the battered women's counselor or sexual assault counselor be disclosed in any civil or criminal proceeding.

\* \* \*

"(e) The privilege established by this section shall not apply: (1) In matters of proof concerning chain of custody of evidence; (2) in matters of proof concerning the physical appearance of the victim at the time of the injury; or (3) where the battered women's counselor or sexual assault counselor has knowledge that the victim has given perjured testimony and the defendant or the state has made an offer of proof that perjury may have been committed. . . ."

In 1985, § 52-146k (b) was amended to read as follows: "On or after October 1, 1983, a battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor at any time by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidential communications waives the privilege, provided under no circumstances shall the location of the battered women's center or rape crisis center or the identity of the battered women's counselor or sexual assault counselor be disclosed in any civil or criminal proceeding. Any request made on or after October 1, 1983, by the defendant or the state for such confidential communications shall be subject to the provisions of this subsection." See Public Acts 1985, No. 85-112, effective October 1, 1985.

selor" and that the victim was a "victim" within the meaning of the statute. The motion also alleged that the coordinator had no knowledge that the victim had offered perjured testimony.

At a hearing on the motion, the defendant asserted his state and federal constitutional rights to compulsory process and confrontation. He also requested an opportunity to make the threshold showing outlined in *State* v. *Esposito,* 192 Conn. 166, 179, 471 A.2d 949 (1984), that the records would be relevant to cross-examination and, therefore, to his right of confrontation. Ruling that § 52-146k was "very clear and unequivocal," the court refused the defendant's request and ordered the subpoena quashed. The defendant then attempted to make an offer of proof requesting production of the records on the issue of the identification of the assailant. The court, interrupting the defendant as he attempted to explicate the offer of proof, stated that although it had granted the motion to quash it would note the defendant's exception.[5] The court also refused

---

[5] After the court ruled that the subpoena must be quashed, the following colloquy occurred:

"Mr. Ruane: For the purpose of, at least, an appellate record in this case, I want to tell the Court that—as I just said and Your Honor denied me the privilege of calling the Rape Crisis counselors and to inquire of them if they obtained a description of the perpetrator—

"The Court: If what?

"Mr. Ruane: If they obtained from [the victim] a description of the person who attacked her, what her degree of certitude was if she made an identification; her narration of the events of the assault if it is contained in the record; whether any advice was given on how to identify the perpetrator in a Courtroom or in a lineup or in a showup; advice as to how to testify in a Courtroom; any notes concerning the advisor noting the demeanor of [the victim] when interviewed; her physical condition; the presence of any third parties at the time these communications occurred other than those contemplated by the statute and whether or not in this particular case, she had prior contact with the Rape Crisis authorities and those same questions would apply to any prior contact with them for any prior crime committed against her.

"The purpose of that, obviously, is to test her ability as a witness to remember, to narrate and to—

defense counsel's request that the records be marked for identification and sealed pending appellate review. Finally, during trial, the defendant attempted on cross-examination to question the victim about her consultation with the rape crisis counselor. The court disallowed the questions.

The crux of the defendant's argument on appeal is that his right to search for truth in defending himself should supersede the interest of the rape crisis service and the victim in maintaining confidentiality. We addressed this very issue in *In re Robert H.*, 199 Conn. 693, 509 A.2d 475 (1986), which was published subsequent to the trial court's ruling on the present motion to quash. In that case, we particularized a procedure, developed in our prior decisions; see *State* v. *Bruno,* 197 Conn. 326, 497 A.2d 758 (1985); *State* v. *Esposito,* supra; which protects a victim's statutory right to confidentiality while simultaneously safeguarding a defendant's constitutional right effectively to cross-examine the victim. *In re Robert H.,* supra, 708–709. Under that procedure, a claim of privilege may be countered by a showing that " 'there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken.' " Id., 708. If such a showing is made and the consent of the witness is secured, the court may conduct an in camera inspection of the information. This inspection, in the context of the sexual assault counselor privilege, is not limited to merely "relevant material." The court may also look for "any inconsistent and relevant statements of the victim in the records when compared with

"The Court: I denied the request.

"Mr. Lyons: Your Honor, you denied—

"The Court: Let me go back and start all over again. I'm granting the motion to quash the subpoena. . . .

"Mr. Ruane: Exception noted.

"The Court: Very well."

the victim's direct examination." Id., 709. In the event the inspection does not reveal such material, the record shall be sealed and made available for appellate review. If the court finds relevant material, however, the witness must choose between consenting to the release of the material or having her testimony stricken. See id., 708–10; *State* v. *Bruno,* supra, 329; *State* v. *Esposito,* supra, 179–80.

This procedure clearly was not followed in the present case. The trial judge summarily quashed the subpoena, denying the defendant even the opportunity to make a preliminary showing of an impairment of his right to confrontation. The state, although acknowledging that *In re Robert H.,* supra, and the present case raise identical issues of law, attempts to distinguish the two cases on their facts. The proffered distinction is that in the former case, counsel sought the records to demonstrate "substantial inconsistencies" in the victim's statements and to show that her testimony "was coached"; id., 698–99; while in the present case, such precise factual allegations were not presented to the court. Precise factual allegations were not made in this case, however, because the defendant was simply not given the opportunity to make them. His every attempt to make the threshold showing, to present the offer of proof, and to cross-examine the victim regarding her consultation with the counselor was squelched by the trial court.

We are not persuaded by the state's assertion that the granting of the motion to quash was harmless. See, e.g., *State* v. *Bruno,* supra. "Whether the defendant was prejudiced by not having access to [the records] cannot be determined by speculation about what [the records] contain." *State* v. *Gonzales,* 186 Conn. 426, 435, 441 A.2d 852 (1982). We also cannot say with certainty, as we did in *State* v. *Bruno,* supra, 335–36, that

the evidence of the defendant's guilt, absent the testimony of the victim, was so overwhelming as to render the error harmless beyond a reasonable doubt.

We have already ordered a new trial based on the erroneous order concerning the witness statements. A remand, pursuant to *In re Robert H.* on the issue of the motion to quash is therefore not required. At the new trial, we direct the court to apply the procedures outlined in *In re Robert H.,* supra, should the defendant again seek to subpoena the records of the rape crisis service. Thus, to obtain the records, the defendant must make the requisite threshold showing which, assuming the victim consents, would enable him to obtain an in camera review of the records. If the court's review reveals relevant material, the victim faces the choice of either waiving her privilege or having her testimony stricken. If the court's inspection fails to uncover any significant material, the records must be sealed for possible review on appeal. See id., 710–11.[6]

## III

### SENTENCING

Because of our holding in this case, we need not consider the defendant's contentions concerning his sen-

---

[6] At oral argument and in a footnote to the defendant's brief, a question was raised concerning the dates on which the communications to the rape crisis counselor occurred. The question suggests that if some of the communications were made prior to October 1, 1983, the effective date of the amendment to General Statutes § 52-146k, the privilege afforded by that provision may be inapplicable. The defendant reasons that prior to the enactment of Public Acts 1985, No. 85-112, which made the privilege applicable to communications made "at any time"; see footnote 4, supra; the privilege did not apply to communications made prior to October 1, 1983. See *State* v. *Lizotte,* 200 Conn. 734, 738–40, 517 A.2d 610 (1986).

We need not discuss this issue, however, because at the new trial we have ordered, the court must apply General Statutes § 52-146k as amended by Public Acts 1985, No. 85-112. Since Public Acts 1985, No. 85-112, makes the privilege applicable to communications regardless of when they were made, the communications in this case would be privileged even if some were made prior to October 1, 1983.

tence. We merely note that the defendant did not object to the length of the sentence at the time it was imposed.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion, PETERS, C. J., and HEALEY, J., concurred.

SHEA, J., with whom CIOFFI, J., joined, dissenting in part. I agree with part II and part III of the majority opinion, but disagree with part I, which gives a defendant a privilege to withhold prior statements of a defense witness that contradict his testimony in court.

The order of the trial court found erroneous by the majority was not issued at any pretrial disclosure proceeding but during trial after the defendant's witness Delores Jackson had testified in support of his alibi. It was an order for discovery of evidence then in court in the possession of the defendant. Such orders have commonly been used in the courts of this state for the purpose of disclosing to a cross-examiner any prior inconsistent statements of a witness after completion of his direct testimony.

"An order to produce can be entered by the court in the course of a trial as to any document then in court and in the possession of the party against whom the order to produce is entered . . . . " *Brown* v. *Connecticut Light & Power Co.*, 145 Conn. 290, 295, 141 A.2d 634 (1958). An order to produce does not make the document automatically available for inspection by opposing counsel, because the court must first ascertain whether it contains irrelevant or privileged material that could not properly be used at trial. *Banks* v. *Connecticut Ry. & Lighting Co.*, 79 Conn. 116, 118–19, 64 A. 14 (1906). Where the document contains prior inconsistent statements of a witness, the court should

permit counsel to examine the statement, except for irrelevant or privileged matters. *Hurley* v. *Connecticut Co.*, 118 Conn. 276, 284, 172 A. 86 (1934).

Before the advent of Practice Book § 752, requiring statements of a prosecution witness to be disclosed after he has testified on direct examination, the rule developed in *Brown* and *Hurley* had been deemed applicable to both civil and criminal cases. *State* v. *Clemente*, 166 Conn. 501, 511–16, 353 A.2d 723 (1974); *State* v. *Pikul*, 150 Conn. 195, 202, 187 A.2d 442 (1962); *State* v. *Pambianchi*, 139 Conn. 543, 548, 95 A.2d 695 (1953); *State* v. *Hayes*, 127 Conn. 543, 601–602, 18 A.2d 895 (1941). In all of these cases statements of prosecution witnesses in the possession of the state's attorney were required to be produced for examination by the court for the purpose of ascertaining whether they contained inconsistencies with the testimony of a witness. Although this case appears to be the first criminal case in this state involving the production of statements of defense witnesses in the possession of the defendant, the clear implication of these authorities is that the *Brown-Hurley* rule is applicable to witnesses for the defense as well as the prosecution in both criminal and civil cases.

Practice Book § 752 modifies our previous procedure with respect to disclosure of prosecution witness statements by removing the trial judge's preliminary inspection of the statement for inconsistencies as a prerequisite to making the statement available to the defendant. The rule leaves no room for the exercise of trial judge discretion, but mandates delivery of the statement after the prosecution witness has testified on direct examination. The *Brown-Hurley* rule, as applied to the statements of defense witnesses, would entitle a defendant to the exercise of such discretion before being compelled to surrender such statements. In this case it does not appear that the trial judge did

conduct a preliminary examination of the statement of the defense witness Delores Jackson before ordering it to be delivered to the prosecutor. This deviation from the *Brown-Hurley* rule, however, was harmless because it is undisputed that her statement contained a glaring and significant inconsistency with her testimony. We need not be concerned in any event, since there must be a retrial because of the rulings concerning the testimony of the rape crisis counselor. At the new trial another judge should not be foreclosed from exercising his discretion to permit disclosure of this highly material inconsistency in the event that Jackson should again be called as a defense witness.

The majority does not address the claim of the defendant that to allow access to statements of witnesses given to investigators employed by the defense may infringe upon the right against self-incrimination, the right to effective assistance of counsel or upon the work product privilege. I think these concerns have been largely set to rest by *United States* v. *Nobles,* 422 U.S. 225, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975). "[T]he Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of third parties called as witnesses at trial." Id., 234. With respect to the work product doctrine and related assistance of counsel claims, the *Nobles* court held that the work product privilege was qualified and that by presenting his investigator as a witness a defendant waived the privilege with respect to matters covered by such testimony; the investigator's report to the defense attorney, therefore, was accessible to the prosecutor. Id., 238–40. "Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on

matters reasonably related to those brought out in direct examination." Id., 239–40. As the opinion notes, the federal courts since 1980, pursuant to rule 26.2 of the Federal Rules of Criminal Procedure, permit disclosure of the statements of witnesses who have testified for the defense as well as those who have testified for the prosecution without distinction.

The cause of truth is ill served by imposing a restriction upon the *Brown-Hurley* rule that heretofore has been understood to apply to both prosecution and defense witnesses. In doing so the majority opinion has created a novel privilege, unwarranted by any constitutional provision, for a defendant to withhold material unquestionably significant in ascertaining whether a witness has testified falsely. In uncovering false testimony of witnesses at a trial a prosecutor should not be placed under a greater handicap than defense counsel.

Accordingly, I dissent from part I of the opinion.