STATE OF CONNECTICUT *v.* JOHN C. HOEPLINGER
(13090)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued November 4, 1987—decision released February 16, 1988

*Richard Emanuel,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Frank S. Maco,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a jury trial, the defendant, John C. Hoeplinger, was found guilty of the crime of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[1] The defendant was sentenced to a term of imprisonment of twenty years. The defendant appealed to the Appellate Court which affirmed the conviction. *State* v. *Hoeplinger,* 9 Conn. App. 147, 517 A.2d 632 (1986). This court granted the defendant's petition for certification.[2]

---

[1] General Statutes § 53a-55 (a) (1) provides: "MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person."

[2] This court certified the following issues for review from the Appellate Court: "A. Whether the Appellate Court erred in concluding that the erro-

The two issues presented by this appeal are: (1) whether the Appellate Court erred when it concluded that the admission of the defendant's statement in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was harmless beyond a reasonable doubt; and (2) whether the Appellate Court erred in reviewing the jury instructions on circumstantial evidence "as a whole" rather than using a "close scrutiny" standard and, regardless of the standard of review, whether the Appellate Court erred in concluding that the trial court's failure to instruct the jury that a fact to be inferred must be proved beyond a reasonable doubt was not erroneous. We reverse the Appellate Court and remand to that court with direction to remand to the trial court for a new trial.

The jury could reasonably have found the following facts: The defendant's wife, Eileen Hoeplinger, was bludgeoned and strangled to death in the early morning hours of May 7, 1982. The defendant called the Easton police department at 4:55 a.m., requesting that an ambulance be sent to his house. The defendant reported that his wife was "in terrible shape" and had blood "all over her face and head." Police and medical personnel soon arrived at the scene where the defendant, crying hysterically, led a police officer into the house. The victim, who had a large laceration on her forehead, lay on a couch and was wrapped in sheets and blankets. There were bloodstains on the wall next to the couch,

neous admission into evidence of the defendant's sixteen page statement, obtained in violation of *Miranda* v. *Arizona*, was harmless beyond a reasonable doubt?

"B. Whether, in a case where all the evidence on the issues of intent and identity was circumstantial in nature, the Appellate Court erred in reviewing the instructions on circumstantial evidence 'as a whole' rather than reviewing them under the 'close scrutiny' standard; and, regardless of the standard of review, whether the Appellate Court erred in concluding that the trial court's failure to instruct the jury that a fact to be inferred must be proved beyond a reasonable doubt, was not error?"

on a coffee table and the rug, and on the floor in the foyer by the front door. The defendant, who had a cut on a finger of his left hand and bloodstains on his shirt and hands, was asked to wait outside the home in the officer's patrol car. After a second police officer arrived, the defendant reentered the house. The defendant was led again to the patrol car and, while seated there, related the following chronology of that night's events: He had awakened during the night, had realized that his wife was not beside him in bed, and had proceeded to search the house for her. He then went outside to look for her and found her covered with blood in a wooded area near the driveway. He returned to the house to get sheets and blankets and then wrapped her in them and carried her into the house before calling the police. The defendant walked to where he had claimed to have found the body, pointing out that spot to the second officer, and then returned to the patrol car.

The chief of police of Easton, Gerard Hance, arrived at the defendant's house shortly thereafter. He was met by the second police officer, who showed him where the defendant had claimed to have found the victim and then took him to view the body. Hance then proceeded to the patrol car, introduced himself to the defendant and asked the defendant to accompany him to the police station in order to relate the events of that night. The defendant acquiesced and was taken by Hance to the Easton police station, where they arrived at about 6 a.m. At the police station, the defendant and Hance proceeded to the chief's office, where the defendant drank coffee and smoked cigarettes. Hance asked the defendant for a written statement of the night's events, but the defendant asked Hance to write down his statement while he spoke. Approximately one and one-half hours after the defendant's phone call to the police, Hance began transcribing the defendant's statement. The defendant's account of the evening was punctu-

ated with various digressions, but Hance would lead him back to the events of the night by reading the last information given by the defendant.

In this sixteen page statement, which was read to the jury, the defendant related, in part, the following: He had retired to bed after seeing his wife sleeping in his daughter's bed. He had "slept like a log" but then had awakened in the middle of the night and had gone to the bathroom. He checked for his wife but she was neither in his daughter's room nor in the spare bedroom. The defendant checked for her downstairs and in the basement before looking outside. After checking the garage for her car, which he found there, the defendant turned on the outside lights and walked up and down the driveway. Finally, he found her off the driveway. He hugged her and spoke to her but she did not answer. The defendant ran back into the house, grabbed some sheets and covers, and returned to his wife. The defendant then carried her back to the house and put her on the couch in the family room. After calling the emergency number, the defendant attempted to clean the blood off the floor so that his children, ages five years and two and one-half years, would not see the blood. The statement mentioned the couple's previous marital problems but also related that "last month everything was so good," that his wife "did oral sex" that night and that "he told her he loved her since he does it every night." Hance read the statement back to the defendant, but he refused to sign it.

Concerning the *Miranda* issue, we should note the following circumstances. At some point, either during the taking of the statement or immediately thereafter, the defendant requested the use of the bathroom. Prior to doing so, Hance had told the defendant not to wash his hands when he went to the bathroom. Although the defendant had agreed not to wash his hands, Hance escorted the defendant to the men's room and stayed

inside the bathroom to make sure that the defendant did not forget not to wash his hands. Neither prior to the taking of the statement nor after was he told that he was free to leave the police station; nor was he expressly told that he was under arrest until about 7:35 p.m. that night. He continued to drink coffee and smoke cigarettes in the chief's office until his lawyer arrived about noon. His attorney was permitted to talk to the defendant in a rear room designated by Hance and where Hance could, and did, observe the conversation through a two-way mirror so that he could make sure nothing happened to the defendant's hands.

Search and seizure warrants were obtained early that afternoon, "near 1 p.m.," and the search warrant for the defendant's person was executed at the police station as the police took swabbings of the defendant's fingers, took fingernail scrapings, and seized his clothing. Later that afternoon, at about 3 p.m., the defendant was transported to St. Vincent's Hospital in Bridgeport so that a blood sample could be obtained and so that he could receive treatment for a cut on his left hand. A police officer drove the defendant to and from the hospital in a police vehicle. The defendant was brought back to the police station "near 6 o'clock" and remained there until 7:35 p.m., when he was arrested. Throughout the thirteen and one-half hour period before his arrest, Hance testified that the defendant, who was "very cooperative," was never told that he should leave or that he was free to leave. It is undisputed that the defendant was never given *Miranda* warnings at any time prior to his arrest that evening.

At the trial, there was evidence that the victim had been bludgeoned in the head with a blunt object and had also been subject to manual strangulation. The cause of death was a compound skull fracture with brain contusions and lacerations, and asphyxia by strangu-

lation. The state's theory of the case was that the defendant had struck his wife with a brick, which it put into evidence, while she was sleeping on the couch in the family room. The defendant, thereafter, allegedly dragged her body outside to a wooded area off the driveway and then dragged her to another wooded area before bringing her back into the house to the couch. The state's case consisted almost entirely[3] of circum-. stantial evidence, including interpretation of the physical evidence by forensic witnesses. Some of the physical evidence was inconclusive; the state's forensic experts were able to testify only that certain of the physical evidence was "consistent with" the state's theory of the case. Certain of that physical evidence, however, was also compatible with the story the defendant had told to the police officers at the crime scene.

The defendant testified at trial and repeated much of what he had related in his statement to Hance. He was cross-examined extensively on his statement, particularly with reference to his prior marital problems and his wife's interest in obtaining a divorce concerning which the state had earlier offered evidence. Among the new facts that the defendant disclosed in his testimony were more details concerning previous marital problems, his wife's intention to seek a divorce in 1980 and an incident in 1981 when he had struck his wife. Consistent with his statement, the defendant testified that he and his wife had not had an argument on the evening of the murder and that his wife had never told him that night that she had intended to seek a divorce.

---

[3] The trial court instructed the jury in part as follows: "Now, it is obvious from the evidence that no one actually saw Mr. Hoeplinger or anyone else kill Mrs. Hoeplinger—that is, there is no direct evidence of Mr. Hoeplinger's participation in this crime—so that all the evidence the prosecution has offered to attempt to prove Mr. Hoeplinger's participation, culpability, and guilt beyond a reasonable doubt in this homicide is what is called circumstantial evidence."

## I

The defendant's first claim is that the Appellate Court erred in its harmless error analysis after properly holding that the defendant's statement to Hance should have been suppressed. The Appellate Court held that even if both the defendant's statement and his trial testimony had not been heard by the jury, the jury "could" still have found the defendant guilty beyond a reasonable doubt, thus rendering the error in admitting the statement harmless beyond a reasonable doubt. *State* v. *Hoeplinger,* supra, 153–54.

## A

Before reaching the harmless error analysis employed by the Appellate Court, it is necessary that we turn to the state's alternative ground of affirmance raised pursuant to Practice Book § 4140.[4] The state asserts

[4] Practice Book § 4140 provides: "PAPERS TO BE FILED BY APPELLANT AND APPELLEE

"(a) Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. Any party to the appeal may also present for review adverse rulings or decisions which should be considered on the appeal in the event of a new trial, provided that he has raised such claims in the appellate court. If such alternative grounds for affirmation or adverse rulings or decisions to be considered in the event of a new trial were not raised in the appellate court, the party seeking to raise them in the supreme court must move for special permission to do so prior to the filing of his brief. Such permission will be granted only in exceptional cases where the interests of justice so require.

"(b) Any party may also present for review any claim that the relief afforded by the appellate court in its judgment should be modified, provided such claim was raised in the appellate court either in such party's brief or upon a motion to reargue.

"(c) Any party desiring to present alternative grounds for affirmance, adverse rulings or decisions in the event of a new trial or a claim concerning the relief ordered by the appellate court shall file a statement thereof within fourteen days from the issuance of notice of certification. Parties shall not file other Sec. 4013 papers on a certified appeal without permission of the supreme court."

that the defendant was not in custody at the time of the statement at issue in this case and therefore the statement should not be suppressed because no violation of the defendant's *Miranda* rights occurred. We disagree with the state and agree with the Appellate Court.[5]

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody and (2) the defendant must have been subjected to police interrogation. *Miranda* v. *Arizona,* supra, 444." *State* v. *Brown,* 199 Conn. 47, 51, 505 A.2d 1225 (1986); *State* v. *Stankowski,* 184 Conn. 121, 136, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). Custodial interrogation occurs when " 'questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' *Miranda* v. *Arizona,* supra . . . ." *State* v. *Brown,* supra. Although what constitutes police custody is not always self-evident, "the *Miranda* court was concerned with interrogation that takes place in a police dominated environment containing 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' *Miranda* v. *Arizona,* supra, 467 . . . ." *State* v. *Januszewski,* 182 Conn. 142, 158, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). The United States Supreme Court has held that "the only relevant inquiry [into custody] is how a reasonable man in the suspect's position would have understood his situation." *Berkemer* v. *McCarty,* 468 U.S.

---

[5] We note that the focus of this court's review "is not on the actions of the trial court, but the actions of the Appellate Court. [This court does] not hear the appeal de novo." *State* v. *Torrence,* 196 Conn. 430, 433, 493 A.2d 865 (1985).

420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *State v. Brown,* supra, 54. This court has stated that a " 'person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *State v. Acquin,* 187 Conn. 647, 655, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); *State v. Ostroski,* 186 Conn. 287, 291–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); *State v. Derrico,* 181 Conn. 151, 159, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)." *State v. Young,* 191 Conn. 636, 651–52, 469 A.2d 1189 (1983). Because the defendant did not testify at the suppression hearing, we do not know if he personally did not feel "free to leave." We must look at the totality of the circumstances of the questioning in order to determine whether a "reasonable person" would have construed those circumstances as placing him in a custody situation.[6]

The Appellate Court's opinion listed a number of pertinent circumstances that point to a finding of custody: The defendant had been "covered with blood" when the officer arrived at his home; the defendant had been escorted twice to the police cruiser at the crime scene; an officer had stood outside the cruiser to which the

---

[6] There is no question that the defendant was subject to interrogation. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Hance's request that the defendant give him a statement concerning what happened that night was an "interrogation" for *Miranda* purposes. *State v. Copeland,* 205 Conn. 201, 207, 530 A.2d 603 (1987).

defendant had been escorted; the defendant had been taken directly to the police station in the police chief's vehicle; the defendant had not been allowed to go to the bathroom alone in order to prevent him from washing his hands; and the defendant had never been informed that he was free to leave. *State v. Hoeplinger,* supra, 152–53. We also note that the defendant was at the police station for over thirteen hours except for a trip to a hospital in a police car. During all of this time, except when talking to his lawyer or when he was permitted to use the telephone, he was in the presence of police officers. When not in their presence, he was under continuous surveillance. Both the physical surroundings of interrogation and its duration are important factors in determining whether a suspect is in custody. *United States* v. *Wauneka,* 770 F.2d 1434, 1438 (9th Cir. 1985). Moreover, the defendant had no personal means of transportation to return to his home, which was five miles away, nor did the police offer any. See, e.g., *State* v. *Ostroski,* supra, 294 (three hour interrogation and no transportation indicate defendant was in custody).

The state merely asserts that the defendant was not restrained and no words of arrest were conveyed to him. These factors, while relevant, are not dispositive of the custody issue. *United States* v. *Wauneka,* supra, 1439 (when officials asked defendant to come to the station and provided transportation, he was in custody); *State* v. *Ostroski,* supra, 292–93. The Appellate Court made a scrupulous examination of the record and, based on the totality of the circumstances, found that the defendant had been in custody and had been deprived of his liberty at the time that the statements had been made. We agree with the Appellate Court and reject the state's assertion that the Appellate Court erred in holding that the defendant had been in custody.

B

Our affirmance of the Appellate Court's holding that the defendant had been subject to custodial interrogation means that the statement given to Hance was inadmissible to establish his guilt. The "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion . . . [which is] irrebuttable for purposes of the prosecution's case in chief . . . ." *Oregon* v. *Elstad,* 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). Even "patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case . . . ." Id.; *Miranda* v. *Arizona,* supra, 444. Moreover, whether the statement is "inculpatory" or "exculpatory" is irrelevant as the *Miranda* decision bars the use of any unwarned statements when there has been a custodial interrogation. *Miranda* v. *Arizona,* supra, 476–77; *State* v. *Brown,* supra, 52 n.4. The fact that the statement should have been suppressed, however, is not dispositive of the issue. We must, as the Appellate Court did, turn to the question, first, whether the erroneous admission of the statement compelled the defendant to take the witness stand and, second, whether the erroneous admission of the statement was harmless beyond a reasonable doubt. See *State* v. *Hoeplinger,* supra, 153.

Our first inquiry is the applicability of the principles of *Harrison* v. *United States,* 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), which are invoked by the defendant. In *Harrison,* a defendant made inculpatory confessions that had been admitted at trial and thereafter he testified on his own behalf. The conviction was overturned because the confessions had been obtained illegally. At retrial, the defendant's prior testimony was read to the jury despite the defendant's objection that he had been induced to testify only because of the introduction against him of the inadmis-

sible confessions. Id., 221. The defendant was convicted again but the United States Supreme Court reversed, holding that the prosecution's use of illegally obtained evidence "prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree . . . ." Id., 222. The court stated: "The question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." (Emphasis in original.) Id., 223. Concerning how to determine whether the illegally obtained evidence in fact impelled the defendant's trial testimony, the *Harrison* court said that "[h]aving 'released the spring' by using the [defendant's] unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony." Id., 225.

The state at oral argument maintained that *Oregon v. Elstad,* supra, handed down after *Harrison,* had called *Harrison* into question. *Oregon v. Elstad,* supra, 318, holds only that once a suspect has "responded to unwarned yet uncoercive questioning [he] is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." The majority opinion in *Elstad* endorses the holding of *Harrison* that any impelled testimony be precluded on retrial. Id., 316–17. In endorsing *Harrison,* the *Elstad* court said that "[i]f the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison* v. *United States,* [supra], precludes use of that testimony on retrial." Id. *Oregon* v. *Elstad* concerns successive confessions and whether a per se rule should prohibit the admissibility

of a second confession obtained under proper procedure after a previous confession is ruled inadmissible because of a procedural *Miranda* violation. See *State* v. *Shifflett,* 199 Conn. 718, 740–41, 508 A.2d 748 (1986).[7] Thus, the state's assertion that *Harrison* has been called into question by *Oregon* v. *Elstad* is incorrect.

Other courts have approved the *Harrison* rationale in determining whether a defendant's trial testimony, which followed an inadmissible statement, is itself inadmissible. See, e.g., *United States* v. *Ledezma-Hernandez,* 729 F.2d 310, 313 (5th Cir. 1984) ("[w]here a defendant takes the stand to overcome the impact of the testimony that has been illegally obtained, the trial testimony itself becomes tainted by the illegally obtained statements"); *Gilmore* v. *Marks,* 613 F. Sup. 282, 286 (E.D. Pa. 1985), rev'd on other grounds, 799 F.2d 51 (3d Cir. 1986); *Lewis* v. *United States,* 483 A.2d 1125, 1132–33 (D.C. App. 1984); *State* v. *Ayers,* 433 A.2d 356, 363 (Me. 1981); *Hillard* v. *State,* 286 Md. 145, 157, 406 A.2d 415 (1979); *State* v. *Clark,* 296 N.W.2d 372, 375 (Minn. 1980); *Jones* v. *State,* 461 So. 2d 686, 702–704 (Miss. 1984); *People* v. *Walker,* 108 Misc. 2d 980, 985, 438 N.Y.S.2d 65 (1981); *Neely* v. *State,* 97 Wis. 2d 38, 50, 292 N.W.2d 859 (1980).

This court has not previously utilized a *Harrison* analysis but, in *State* v. *Buteau,* 136 Conn. 113, 116, 68 A.2d 681 (1949), cert. denied, 339 U.S. 903, 70 S. Ct. 516, 94 L. Ed. 133 (1950), a pre-*Harrison* case, it was faced with a claim of illegally obtained evidence that had

---

[7] The precise holding of *Harrison* concerns the use of impelled testimony at retrial, not whether the testimony at the first trial must be stricken for the purposes of a harmless error analysis. The lower court in *Harrison* reversed the defendant's conviction because of the illegally obtained confessions and did not use a harmless error analysis. *Harrison* v. *United States,* 359 F.2d 214, 222 (D.C. Cir.), on rehearing en banc, 359 F.2d 223 (D.C. Cir. 1965). Therefore, the focus of the United States Supreme Court was on the use of the impelled testimony on retrial, not whether the outcome of the first trial could be affirmed on the basis of harmless error.

forced a defendant to testify. Although the court found that the evidence was admissible; id., 123; it also stated by way of dictum: "The evidence was offered as a part of the state's case in chief, and had it not been admitted it may well have been that the defendant would not have testified. For that reason, the admission of the testimony, if erroneous, cannot be claimed to have been harmless." Id., 116.

We turn to whether the defendant's trial testimony was impelled by the use of the illegally obtained statement. Noting the difficulty of "unravel[ing] the many considerations that might have led the [defendant] to take the witness stand"; *Harrison* v. *United States,* supra, 224; the United States Supreme Court has placed the burden on the government to "show that its illegal action did not induce his testimony." Id., 225; *Oregon* v. *Elstad,* supra, 308.[8] The state's case consisted almost entirely of circumstantial evidence including physical evidence which had been attacked by the defendant as inconsistent and inconclusive. With the exception of a neighbor who observed lights at the defendant's house at an abnormally late hour, there were no witnesses to any suspicious activity by the defendant that night. The defendant's statement, although exculpatory on its face, was potentially harm-

---

[8] The state suggests that our earlier decision in *State* v. *Conroy,* 194 Conn. 623, 484 A.2d 448 (1984), precludes our consideration of the defendant's claim that he was impelled to take the witness stand as the result of the admission of his written statement because there was no such claim made at trial. See id., 627 n.5. We do not agree.

*Conroy* is readily distinguishable. In *Conroy,* the defendant objected at trial to admission of testimony by state trooper Richard Connors that he (Connors) had " 'received a phone call from Sergeant Tucci, of the Woodbridge Police Department, in regards [sic] to [the defendant] Kevin Conroy being involved in burglaries." Id., 626. That was objected to as hearsay and as being more prejudicial than probative. There was no constitutional claim at trial; on appeal Conroy claimed that the admission of such testimony forced him to testify in violation of his fifth amendment right not to do so, thus imposing upon the state the burden to prove the harmless-

ful to him in a number of ways: It buttressed the state's theory of the case, particularly as to motive; it was inconsistent with independent trial testimony concerning the state of the defendant's relationship with his wife; and it generally put the defendant's credibility in a very poor light. The fact that a statement may be facially exculpatory does not preclude its use by the state for an inculpatory effect. As the *Miranda* court realistically recognized, "[i]f a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication." *Miranda* v. *Arizona,* supra, 477; see also *Rhode Island* v. *Innis,* 446 U.S. 291, 309 n.5, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). We hold that, in the circumstances of this case, the state has not satisfied its burden of proving that the inadmissible pretrial statement did not induce the defendant's trial testimony.

The dictates of *Harrison* v. *United States,* supra, as approved in *Oregon* v. *Elstad,* supra, provide that both

ness of that concededly erroneously admitted evidence beyond a reasonable doubt. We refused to do so pointing out, inter alia, that the record was silent as to the reason for his decision to testify.

In this case, unlike *Conroy,* we are dealing with the defendant's own statement, which was erroneously admitted in the state's case in violation of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), a constitutional violation. In this case, unlike *Conroy,* because the defendant's *own* statement is involved, the defendant has invoked *Harrison* v. *United States,* 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), which we decide we must consider given the factual pattern in this case which certainly was not present in *Conroy.* Moreover, the applicability of *Harrison* imposes the burden upon the state, having "illegally obtained and hence improperly introduced" this defendant's statement to "show that its illegal action did not induce his [defendant's] testimony." Id., 223, 225. In this case, the constitutional error at trial involved evidence concerning the very crime for which the defendant was on trial, whereas in *Conroy,* the challenged evidence did not.

the defendant's statement obtained in violation of *Miranda* and his impelled trial testimony should have been suppressed. Before we order a new trial on this ground, however, we must first determine if the jury would still have found the defendant guilty beyond a reasonable doubt even if both the defendant's statement and his testimony had not been admitted into evidence at trial. *State* v. *Ayers,* supra; *Hillard* v. *State,* supra. If so, a retrial would be unnecessary as this federal constitutional error would be harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Marino,* 190 Conn. 639, 657, 462 A.2d 1021 (1983).

C

The Appellate Court concluded that even if the defendant's statement and his trial testimony had not been heard at trial, the jury could still have found the defendant guilty beyond a reasonable doubt. *State* v. *Hoeplinger,* supra, 153. It supported its decision by noting that "[t]he impact of the error upon the trier and the result could only have been favorable to the defendant." Id., 154. We disagree.

In order to assess the harmfulness of the error, "the test is whether 'there is a reasonable possibility that the improperly admitted evidence contributed to the conviction.' *Schneble* v. *Florida,* 405 U.S. 427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972)." *State* v. *Shifflett,* supra, 751–52. The " 'harmfulness of an error depends upon its impact on the trier and the result . . . .' *State* v. *Bruno,* 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.,* concurring)." *State* v. *Ortiz,* 198 Conn. 220, 225, 502 A.2d 400 (1985). As the United States Supreme Court said in *Chapman* v. *California,* supra, 24, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harm-

less beyond a reasonable doubt." This court has held in a number of cases that when there is independent "overwhelming evidence" of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. See, e.g., *State* v. *Whitaker,* 202 Conn. 259, 272–73, 520 A.2d 1018 (1987); *State* v. *Leecan,* 198 Conn. 517, 533, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); *State* v. *Bruno,* supra, 335–36; *State* v. *Gordon,* 185 Conn. 402, 419, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982).

Before we discuss the Appellate Court's conclusion that there was overwhelming evidence of guilt, we first must examine the standard that it used in its analysis. The Appellate Court concluded that "the jury *could* still have found the defendant guilty beyond a reasonable doubt." (Emphasis added.) *State* v. *Hoeplinger,* supra, 153. This standard is not the appropriate one for deciding whether an error in a criminal case is harmless beyond a reasonable doubt. The use of the word "could" implies a sufficiency of the evidence standard. As Justice Shea observed in a concurring opinion in *State* v. *Bruno,* supra, 336, "[l]egal sufficiency of the evidence is not the test for harmless error . . . . The harmlessness of an error depends upon its impact on the trier and the result, not upon whether the particular evidence involved was legally essential to support the finding." See *United States* v. *Hernandez,* 574 F.2d 1362, 1372 (5th Cir. 1978) (error not harmless "[a]lthough there appears to be an ample basis to sustain the conviction"); *State* v. *Moscone,* 171 Conn. 500, 508–509, 370 A.2d 1030 (1976) (*Miranda* violation was not harmless "despite the abundance of properly admitted evidence which tended to prove the defendant's guilt"); *State* v. *Dullivan,* 10 Conn. App. 474, 479, 523 A.2d 1353 (1987), citing *Rose* v. *Clark,* 478 U.S. 570, 584, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) (Burger, C.J.,

concurring) (the evidence was " 'sufficient' " but not " 'overwhelming' "); *People* v. *Rivers,* 64 App. Div. 2d 834, 835, 407 N.Y.S.2d 937 (1978) (error not harmless even though there was "a substantial quantum of credible evidence to support a conviction"). The proper standard is whether any reasonable jury *would* have found the defendant guilty if the improperly admitted evidence had been excluded. We note, however, that even if the Appellate Court's use of the word "could" instead of "would" was inadvertent, we still disagree with its conclusion that the error was harmless beyond a reasonable doubt.

We now turn to the evidence to see if it is "overwhelming" so that it establishes the defendant's guilt beyond a reasonable doubt. The state's theory of the case drew support from independent testimony that the defendant and his wife had previous marital problems. Linda Cooper, a cousin of the victim, testified to a possible motive when she maintained that on the evening of May 6, 1982, the victim had told her that she intended to tell the defendant about her decision to seek a divorce. There is no evidence that the victim said when she would tell the defendant of her decision to do so. The state also offered other evidence tending to show the existence of marital problems. Much of the case, however, consisted of physical evidence and its interpretation by the state's forensic experts. Although most of the physical evidence was "consistent," according to the state's forensic experts, with the state's theory of the case, that evidence was hardly conclusive. On cross-examination, the state's main expert witness, Dr. Henry Lee, head of the Connecticut state police forensic laboratory, was forced to concede that some of the key evidence concerning blood spatter marks on the defendant's sneakers was "not definite" but only "consistent" with the state's theory. He also admitted that this evidence could be consistent with many other things.

Another forensic expert for the state, Herbert Mac-Donnell, after testifying that certain blood spatter marks were consistent with medium velocity impact, conceded on cross-examination that his own book advised that when evaluating small samples, as in this case, it was impossible to differentiate between medium velocity blood spatters and castoff.[9] Although the victim's blood was found all over the defendant's clothes and on his person, this fact was also consistent with the version that he related to the police at the scene that he had brought his wife into the house after finding her outside.

The evidence presented at trial, excluding the defendant's written statement and his testimony, does not reach the standard of "overwhelming evidence" that must be met to find a constitutional error harmless beyond a reasonable doubt. See *Chapman* v. *California,* supra. On the other hand, although the defendant's statement and testimony appeared to be exculpatory, it is probable that they had the opposite effect. During its cross-examination of the defendant, the state used his written statement on numerous occasions to examine him on matters that indicated that he had not been truthful not only in his version of what happened the night the victim died, but particularly concerning his claims of the state of his marital problems. His credi-

[9] A large portion of the state's forensic evidence concerned serological evidence, principally from Dr. Henry Lee and Herbert MacDonnell. MacDonnell testified that a certain pattern of small blood spots indicates "medium velocity spatter." This pattern is produced when a force meets a source accumulation of blood. He also stated that "a beating is the source of medium impact spatter." MacDonnell's and Lee's testimony also discussed blood castoff patterns, which are made when blood drips off an object. A focal portion of the trial testimony in this area concerned whether the blood patterns on the defendant's sneakers were actually made by medium velocity spatter, consistent with a blunt force hitting a source accumulation of blood, or whether the blood spots were consistent with blood drops that were produced when a bleeding person or a bloody object is being carried.

bility was not just attacked but was seriously undermined, if not effectively devastated, by his testimony and the use of his improperly obtained statement. These claimed contradictions between the defendant's version of events and other independent evidence, especially concerning the state of his marriage, and the general unbelievability of some of his assertions were also highlighted by the state in its closing argument. The state's attorney in final argument remarked: "[The defendant is] stuck with that incredible story. By his own words when he's taken the witness stand he's convicted himself." That the jury regarded the defendant's testimony as important is demonstrated when it requested that his testimony be reread. We disagree with the Appellate Court's conclusion that the admission of this testimony "could only have been favorable to the defendant." *State* v. *Hoeplinger,* supra, 154. The error in admitting the defendant's statement was not harmless beyond a reasonable doubt.

## II

Although the first issue is dispositive of the appeal, we will discuss briefly the defendant's claims regarding the Appellate Court's review of allegedly erroneous jury instructions since they may arise in the new trial we order. The defendant claims (1) that the Appellate Court erred in reviewing the instructions on circumstantial evidence as a whole rather than under the close scrutiny standard set out in our previous cases, and (2) that the Appellate Court erred in approving the trial court's failure to instruct the jury that a fact to be inferred must be proved beyond a reasonable doubt.

Our analysis begins with the challenged instructions themselves. An examination of them reveals that they are not erroneous. Moreover, the Appellate Court never identified any portion of the challenged instructions as

erroneous. There is no question that the Appellate Court did state that the "instructions on circumstantial evidence and the use of inferences, *reviewed as a whole,* were not erroneous"; *State* v. *Hoeplinger,* supra, 160; but it did so without saying, or even implying, that the particular instructions attacked were erroneous. Under these circumstances, we need not go further. This is so even if we were to assume that the Appellate Court came to its conclusion after reviewing *all* of the instructions as a whole, having determined, as it did, that "both the identity of the victim's assailant, and the intent of the defendant" were factual issues; id., 158–59; thus calling for "whole charge" review. See, e.g., *State* v. *Robinson,* 204 Conn. 207, 210, 527 A.2d 694 (1987). We find no error on this claim.

The defendant also argues that, when virtually all the evidence in a case is circumstantial in nature, the jury must be expressly instructed that "inferred" facts as well as "basic" facts must be proved beyond a reasonable doubt. The jury in this case was amply instructed about the state's burden to prove guilt beyond a reasonable doubt and the defendant fails to articulate how this jury used any standard of proof other than the proper one. We decline to require such an instruction.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand to the trial court for a new trial.

In this opinion the other justices concurred.