STATE OF CONNECTICUT *v.* CHRISTOPHER
HAFFORD
(SC 16089)

McDonald, C. J., and Borden, Norcott, Katz, Palmer, Sullivan and Spear, Js.

Argued November 3, 1999—officially released March 7, 2000

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. The defendant, Christopher Hafford, was tried before a three judge panel, *Barry, Norko* and *Langenbach, Js.*, and convicted of capital felony in violation of General Statutes § 53a-54b (7), felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and (3), burglary in the first degree in violation of General Statutes § 53a-101 (a) and sexual assault in the first degree in violation of General Statutes § 53a-

70 (a).[1] Pursuant to General Statutes (Rev. to 1991) § 53a-46a,[2] the panel conducted a penalty hearing. The

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . ."

General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or a third person . . . ."

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime . . . or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or . . . (3) uses or threatens the use of a dangerous instrument . . . ."

General Statutes § 53a-101 (a) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily harm on anyone."

General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes (Rev. to 1991) § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g) and any aggravating factor set forth in subsection (h). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (h) of this section exists or that one or more mitigating factors exist. Such hearing shall be conducted (1)

panel concluded that the state had proved an aggravat-

before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

ing factor[3] and that the defendant had proved a mitigating factor.[4] Accordingly, the panel imposed a sentence

"(g) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (e) that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

[3] The panel concluded: "[T]he court finds that the state has proven, beyond a reasonable doubt, that the murder of [the victim] was committed in an especially cruel manner, in that [the defendant] intentionally inflicted extreme pain and torture on [the victim] above and beyond that which would necessarily accompany the underlying killing."

[4] The panel concluded that the defendant had not proved the statutory mitigating factors that his mental capacity and his ability to conform his conduct to the requirements of the law were significantly impaired. See General Statutes (Rev. to 1991) § 53a-46a (g) (2). The panel concluded that

of life imprisonment without the possibility of parole for the capital offense. See General Statutes § 53a-46a (f). The panel also imposed two twenty year sentences for the burglary and robbery convictions, to run consecutive to each other and to the life sentence, for a total effective sentence of life plus forty years.[5] The defendant appealed from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3).[6]

The panel reasonably could have found the following facts. On July 14, 1991, the defendant arrived at Grillo's Shell Station, a convenience store and gas station in Windsor Locks, sometime after 7 a.m., planning to commit a robbery. When all the customers had left the store, the defendant put on a pair of latex gloves, armed himself with a knife and entered the station. The defendant approached the lone station attendant, Theresa Ann Rafferty, the victim, displayed his knife and demanded the money in the cash register. The victim

the defendant had proven the existence of a nonstatutory mitigating factor: "With regard to the nonstatutory mitigating factors claimed by the defendant, the court finds that the defendant has proved, by a fair preponderance of the evidence, that at the time of the offenses, [the defendant's] mental capacity was impaired, but not so impaired as to constitute a statutory mitigating factor. And at the time of the offenses, [the defendant's] ability to conform his conduct to the requirements of the law was impaired, but not so impaired as to constitute a statutory mitigating factor. However, this court finds this to be a nonstatutory mitigating factor, by a fair preponderance of the evidence. The court further finds, by a fair preponderance of the evidence, that [the defendant] gave both oral and written statements to the police shortly after his arrest, fully admitting his guilt. He was remorseful, cooperative, and regretful. The court finds that these factors, when considered in combination with the other mitigating factors found, in fairness and in mercy, constitutes a mitigating factor."

[5] The panel did not impose any sentences for the counts of murder, felony murder or sexual assault in the first degree, as it concluded that they were lesser included offenses of the defendant's capital felony conviction.

[6] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

gave the defendant the cash in the register, which totaled approximately $85. The defendant then forced the victim into a back room of the station, ordered her to take off her clothes, and sexually assaulted her. The defendant then slashed the victim with the knife and beat her with a shovel. She sustained massive head injuries, and died from a combination of the stab wounds and the trauma to her head.

At 7:30 that morning, Richard O'Brien arrived at the gas station. When O'Brien entered the station, he saw bloody footprints on the floor, leading toward the back room. O'Brien followed the footprints into the back room and saw the victim's naked and bloody body. O'Brien exited the store to call the police. As he was leaving, O'Brien met Frederick Britschock, who was driving up to the station. O'Brien told Britschock not to enter the store because a crime had been committed. O'Brien quickly drove home and called the police. Britschock also called the police from the pay telephone outside the station. When O'Brien returned, he and Britschock waited in front of the station for the police to arrive.

At that time, the defendant, who was still inside the three bay area of the station, threw a fire extinguisher through a glass door to escape from the building. O'Brien heard the crash of glass. He and Britschock looked toward the noise and saw the defendant exit the building, get into his car and begin to drive away. They ran after the car, pointing at it. David Clark, an off-duty Windsor Locks police officer, was driving by the station when he saw the two men gesturing toward the car that was leaving it. Clark heard O'Brien shout "That is him!" Clark chased the defendant's car north toward Massachusetts, but ended his chase because he did not have radio contact with the Windsor Locks police department. At 7:38 a.m., Clark telephoned the Windsor Locks police and gave a description of the

defendant, his car, and the Massachusetts license plate number of the car. The dispatcher relayed that information to police departments in both Connecticut and Massachusetts.

James Donovan III, a police officer in Agawam, Massachusetts, saw the defendant's car parked in front of a convenience store in Agawam at 7:50 a.m. Donovan pulled his cruiser behind the defendant's car and called for assistance. When the defendant came out of the convenience store, Donovan asked him if the car was his. The defendant answered "yes," and Donovan pointed his pistol and ordered the defendant to put his hands on the hood of the cruiser. Agawam Police Officers Mark Pfau and Steven Grasso then arrived at the scene, at which time Pfau read the defendant his *Miranda*[7] rights. Agawam Police Sergeant Gary Nardi also read the defendant these rights, and the defendant said that he understood them. Windsor Locks Police Officer Thomas Malcolm arrived on the scene and read the defendant his *Miranda* rights a third time, and the defendant indicated that he understood those rights. Pfau and Grasso then placed the defendant in their cruiser and drove him to the Agawam police department. During his arrest, the defendant, after being advised of his rights, volunteered four or five times, "I did it."

The defendant was placed in a holding cell at the Agawam police department. Around 9:30 p.m., Connecticut State Police Detectives Ronald Ruel and Harold McDermott executed a search warrant for evidence from the defendant's person. McDermott read the defendant his *Miranda* rights before executing the search warrant, and the defendant indicated that he understood those rights. McDermott then collected samples of hair, blood and saliva from the defendant

---

[7] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

and seized some of the defendant's clothing. Later examination revealed that: the bloody footprints at the gas station matched the impression of the defendant's boots; glass samples found in the defendant's boots matched the broken glass from the gas station garage; a hair found near the victim's body was microscopically consistent with the defendant's pubic hair; and blood stains on the defendant's boots, on the left cuff of the defendant's pants, on the defendant's shirt and on the knife found in the defendant's car, all matched the victim's blood type.

On appeal, the defendant makes five claims. First, he claims that the trial court improperly denied his motion to suppress his confession, which the defendant claims had been obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Second, the defendant argues that he is entitled to a new trial because the three judge panel failed to obtain a waiver of his right to trial by jury. Third, the defendant claims that the trial court lacked jurisdiction over the charge of felony murder predicated on sexual assault in the first degree because there was never a finding of probable cause as to that offense. Fourth, the defendant argues that there was insufficient evidence of a burglary to support the charges of burglary in the first degree and felony murder based upon a predicate felony of burglary. Fifth, the defendant claims that the three judge panel improperly admitted into evidence, in violation of the corpus deliciti rule, his confession that he had sexually assaulted the victim. We reject each of the defendant's arguments, and we affirm his convictions.

I

The defendant first claims that the court improperly denied his motion to suppress his confession to Ruel, one of the Connecticut state police detectives. The fol-

lowing additional facts are necessary to resolve this issue. At 10 a.m. on July 14, 1991, shortly after the defendant's arrest, Robert Koistinen, a Windsor Locks police officer, went to the Agawam police station to obtain a statement from the defendant. At that time, however, Koistinen did not speak with the defendant.[8]

At approximately 9:30 p.m. that evening, while executing a search warrant upon the defendant's person, Ruel asked the defendant if he wanted to make any statements regarding his arrest. The defendant answered that he did not want to make any statements at that time and that he thought he would call his mother because she might have called a lawyer. Ruel told the defendant that the Agawam police officers would allow him to make that call. Without any further conversation, Ruel and McDermott left the defendant to return to Connecticut.

At 10:30 p.m., Officer Stanley Chmielewski, Jr., of the Agawam police, was fingerprinting the defendant in the booking room of the Agawam police department. The defendant asked Chmielewski what would happen to him next. Chmielewski answered that he did not know because the Connecticut state police were in charge of the investigation. The defendant then told Chmielewski that he would like to talk to the Connecticut police. Chmielewski relayed this information to his lieutenant.

Ruel was getting into his car to leave the Agawam police station when an officer called him back into the building, saying that the defendant had asked to speak with the Connecticut police. Later, Ruel entered the

---

[8] Koistinen testified that he did not speak with the defendant on the morning of July 14, 1991, because an Agawam police officer had told him that the defendant had requested an attorney. Koistinen could not identify the person at the Agawam police department who had given him this information, however, and no Agawam officer testified that he knew of the defendant's alleged request for an attorney. On this record, the panel declined to find that the defendant had asked the Agawam police for counsel.

defendant's cell, read the defendant his *Miranda* rights, and the defendant signed an advisement card. The defendant then asked Ruel what would happen to him during the entire arrest process. Ruel told the defendant that he would appear in court in Springfield, Massachusetts, the next day as a fugitive from justice, and that he then would be extradited to Connecticut to stand trial. The defendant told Ruel that he wanted to tell the police what had happened and that he wanted to get it "off his chest." Ruel advised the defendant of his rights once again. The defendant proceeded to describe to Ruel the events of the murder.[9] After making his oral statements, the defendant agreed to make a written statement about the crime. Ruel read the defendant his *Miranda* rights again and asked him to sign a full page waiver of those rights, which the defendant did. Ruel then typed the defendant's version of the crime as the defendant retold the story for the written statement. The written statement indicated that, while the defendant previously had told the Agawam police that he did not wish to make a statement, he had changed his mind and presently wished to tell the police what had happened at the gas station. The defendant stated that, at knife point, he took money, coerced the victim into a back room and forced her to perform oral sex on him. The defendant further stated that, when he was unable to maintain his erection, he walked around behind the victim while she was still kneeling. The victim then got up and reached for the knife. A struggle ensued, during which the victim stabbed the defendant in the abdomen.

---

[9] On cross-examination, Ruel admitted that he encouraged the defendant to tell his side of the story:

"[Barry A. Butler, Defense Counsel]: Would it be fair to say that you encouraged him to give a statement?

"A. I asked him for his side of the story.

"Q. So I take it that is a yes, you encouraged his giving a statement, is that fair to say?

"A. Yes."

The defendant then stabbed the victim repeatedly and beat her over the head with a shovel.[10]

When he finished typing, Ruel showed the statement to the defendant and asked him to make any corrections or changes that he wanted to include.[11] The defendant then signed the written statement. At some point near the end of the meeting, the defendant stated that the wound in his abdomen was causing some discomfort,[12] and Ruel indicated that the Agawam officers would see to that. Ruel left the defendant's cell at 2 a.m. on July 15, 1991.

At 2:38 a.m. on July 15, 1991, Agawam emergency medical technician Kenneth Blair and Officer Paul Mur-

---

[10] The defendant's written statement reads in relevant part: "While in the back room I told her to take her clothes off. Once she removed her clothing I wanted to have sex with her. I told her to get on her knees as I unzipped my pants. She began to suck my penis but then I pulled out when I started to go soft. I then walked behind her touching her shoulder with one hand and the knife with the other. She asked, 'please, don't hurt me.' She started to get up real quick and reached for my wrist which started a struggle. The knife fell apart and I ended up with the handle and she reached for the blade which was on the floor. As we struggled for the blade I got cut in the stomach. I was then able to grab her and take the blade away from her. We were both on our knees as I stabbed her in the abdomen then again in the upper chest near her neck. I went crazy and kept slashing at her as she tried to grab the knife. She had screamed a couple of times during the struggle. I stood up as she lay on the floor breathing real rough. I had thrown the knife on the floor and grabbed the sink. When I turned around I grabbed a shovel (square with a long handle) that was near the sink. I swung the shovel over her head and struck her in the head with the flat side of the shovel several times. I kept swinging until I didn't hear her breathing any more. I left the shovel there and grabbed my knife from the floor and also took the knife handle and put it in my back pocket. . . ."

[11] The defendant made minor changes to the statement. For example, where the defendant described buying a pack of gum from the victim prior to the crime, he altered the statement to reflect the type of gum he had purchased (Juicy Fruit).

[12] Previously, Ruel twice had asked the defendant if the stab wound was bothering him, once while executing the search warrant and once before obtaining the defendant's confession. Both times, the defendant stated that the wound was not bothering him.

phy were dispatched to the defendant's cell to examine the stab wound in his abdomen. They determined that the wound required sutures, and they transported the defendant to the hospital. After the defendant received treatment at the hospital, Donovan transported him back to his cell.

At trial, the defendant moved to suppress the oral and written confessions given to Ruel during the night of July 14, 1991, and into the early morning hours of July 15, 1991. The court denied the defendant's motion. The defendant moved for an articulation of decision. In a memorandum of decision, the court made the following findings: "(1) That on July 14, 1991, the defendant was in police custody at the Agawam, Massachusetts police department; (2) That at approximately 10:30 p.m., on July 14, 1991, the defendant notified a member of the Agawam Police Department that he wanted to talk to a Connecticut investigative officer; (3) That Detective Ruel was notified of the defendant's wishes and responded by going to the defendant's cell where, at approximately 11:14 p.m., [Ruel] advised [the defendant] of his *Miranda* rights and the defendant waived them; (4) That earlier that evening the defendant indicated to Detective Ruel that his mother may have called an attorney [and] Ruel advised him that he would be allowed to make calls but the defendant made no response to that offer; (5) That the defendant told Detective Ruel 'that he did want to tell us about what had happened and something to the effect of wanting to get it off his chest'; (6) That at no time did the defendant specifically invoke his right to counsel during the late evening of July 14, 1999 or the early hours of July 15, 1991." The court concluded that "the oral and written statements made by the defendant to Detective Ruel on July 14, 1991 and July 15, 1991 were made voluntarily by the defendant after being advised of his *Miranda* rights and after the defendant knowingly and intelligently waived those rights."

The defendant claims that the trial court improperly concluded that the defendant had waived his rights

under *Miranda* v. *Arizona*, supra, 384 U.S. 436, before confessing to Ruel. He argues that his statement that he wanted to call his mother because she might have called a lawyer constituted an equivocal request for a lawyer, which Ruel should have clarified in order to establish a valid waiver of *Miranda* rights. The defendant also claims that his confession was not a free and voluntary act, and that his lack of sleep and the untreated stab wound in his abdomen were evidence that the confession was coerced.

The state argues that the defendant waived his right to challenge the admissibility of his confession when he used that confession as evidence of a mitigating factor at the capital felony penalty hearing. On the merits, the state argues that the defendant made a knowing, intelligent and voluntary waiver of his *Miranda* rights and that his confession was voluntary. The state further argues that admission of the defendant's confession, even if improper, was harmless in light of the overwhelming evidence of the defendant's guilt, independent of the confession.

A

We first address the state's argument that the defendant's use of his confession as a mitigating factor at the penalty hearing constituted a waiver of his right to contest the admissibility of his confession.[12a] We decline to hold that the defendant waived his rights by presenting the confession as mitigating evidence at the penalty hearing. A confession obtained in violation of *Miranda* may still be a voluntary confession, relevant to remorse and cooperation. See *State* v. *Roseboro*, 221 Conn. 430, 444, 604 A.2d 1286 (1992) (defendant's state-

---

[12a] The state claims that the defendant waived his right to appeal this issue by *successfully* using his confession as a mitigating factor. The state's posture is that the defendant would not have waived his right to appeal if the panel had not found the confession to be mitigating. Because "[a] waiver is ordinarily an *intentional relinquishment or abandonment* of a known right or privilege"; (emphasis added) *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); waiver implies some action by the defendant. We fail to see how the defendant's waiver of his right to appeal could depend on the panel's findings with respect to a mitigating factor.

ments to police were voluntary, although procured in violation of *Miranda*); see also *State* v. *Shifflet*, 199 Conn. 718, 727–34, 508 A.2d 748 (1986) (voluntariness of confession and waiver of *Miranda* rights are two distinct questions that require separate analyses). As to the issue of voluntariness of the confession, although the defendant argued that there were factors affecting his decision to make a confession, the panel found his statements to be voluntary. We reject the state's claim that the defendant waived his right to appeal the issues by asserting his voluntary confession as a mitigating factor at the penalty hearing.

B

On the merits, the defendant first argues that the trial court improperly concluded that he knowingly, voluntarily and intelligently had waived his *Miranda* rights before confessing. The defendant asserts that, under federal law, police are required to clarify an equivocal request for counsel before continuing to interrogate a suspect. Alternatively, the defendant argues that article first, § 8, of the constitution of Connecticut[13] requires clarification of an ambiguous request. We disagree with both contentions.

"Any inquiry into the admissibility of a confession obtained while a defendant is in custody must of course begin with *Miranda* v. *Arizona,* supra [384 U.S. 436]. In that case, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that a suspect in police custody be informed specifically of his or her right to remain silent and to have an attorney present before being questioned. [Id.], 444, 479. The court further held that '[i]f the individual indicates in

---

[13] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease'; id., 473–74; and '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.' Id., 474. Furthermore, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' Id., 475." *State* v. *Acquin*, 187 Conn. 647, 666, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983).

In *Edwards* v. *Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the United States Supreme Court held that, after an accused requests counsel, further conversations between the police and the accused do not violate *Miranda* if the accused initiates them. In *Edwards*, the defendant was advised of his *Miranda* rights and then submitted to questioning. Shortly thereafter, the defendant clearly stated that he wanted an attorney, and interrogation ceased. Id., 479. The next morning, two detectives came to the jail and asked to see the defendant. Id. The defendant told the guard that he did not want to talk to anyone, and the guard replied that the defendant "had" to talk. Id. The guard then took the defendant to see the detectives. Id. The detectives read the defendant his *Miranda* rights and the defendant agreed to talk with them, as long as his statement was not tape-recorded. Id. The United States Supreme Court reversed the Arizona Supreme Court's conclusion that the defendant had waived his *Miranda* rights, stating that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been

advised of his rights. We further hold that an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. . . . Had [the defendant] initiated the meeting . . . nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." Id., 484–85.

In *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1041, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983), the defendant was advised of his *Miranda* rights and then told police his version of events relating to the crime. Later, the defendant requested an attorney and interrogation ceased. Id., 1041–42. The defendant subsequently asked a police officer, "Well, what is going to happen to me now?" Id. Before answering, the officer advised the defendant of his *Miranda* rights again and told him that he did not have to speak. Id., 1042. The defendant continued to converse with the officer, and agreed to submit to a polygraph examination, during which he made incriminating statements. Id. The United States Supreme Court reversed the Oregon Court of Appeals' decision to suppress the defendant's statements, holding that the defendant had initiated the conversation, under *Edwards* v. *Arizona*, supra, 451 U.S. 477, and that the defendant clearly had waived his *Miranda* rights. The court referred to the meaning of "initiation" as including inquiries that can "be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon* v. *Bradshaw*, supra, 1045. The court held that the defendant's "initiation" of further conversation does not end an analysis of waiver under *Miranda*. "But

even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Id., 1044.

Following *Miranda* and *Edwards*, we held that, as a matter of federal constitutional law, once a defendant makes an equivocal request for counsel, the scope of police interrogation is limited to questions designed to clarify that request. *State* v. *Acquin*, supra, 187 Conn. 647. Although we have held that clarifying questions are *permitted*, however, we have never held that such clarification is *required*, even when, following initiation by the defendant, the police continue to question the defendant and eventually obtain a confession. *State* v. *Anonymous*, 240 Conn. 708, 723 n.16, 694 A.2d 766 (1997). In *Davis* v. *United States*, 512 U.S. 452, 455, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), however, the United States Supreme Court held that police are not required to clarify an equivocal request for an attorney before continuing an interrogation. In *State* v. *Anonymous*, supra, 720, this court followed *Davis* and held that the defendant's question "Do I still have the right to an attorney?" was not an unequivocal request for an attorney and that police had no duty to clarify the ambiguous statement.

The defendant argues that his confession was admitted contrary to the requirements of *Miranda* v. *Arizona*, supra, 384 U.S. 436, and *Edwards* v. *Arizona*, supra, 451 U.S. 477. He argues that *Edwards'* initiation of contact doctrine should only apply where the defendant first waives his rights and later asks for counsel. The defendant argues that because he had not waived his *Miranda* rights prior to making his equivocal request for an attorney, initiation is irrelevant and Ruel had a

duty to clarify the defendant's earlier, ambiguous request.

Nothing in *Edwards* or *Bradshaw* indicates that their holdings apply only in postwaiver scenarios, and it does not appear that the defendant's postwaiver scenario played any part in the United States Supreme Court's reasoning. We can find no rational basis to distinguish between the case of an accused who first asserts his *Miranda* rights and one who changes his mind after waiving those rights. *Miranda* warnings were put forth by the United States Supreme Court to establish a simple means to ensure that an accused's fifth and sixth amendment rights are respected during custodial interrogation. "[O]ne of the principal advantages of *Miranda* is the ease and clarity of its application." (Internal quotation marks omitted.) *Arizona* v. *Roberson*, 486 U.S. 675, 680, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988). The rule urged by the defendant would only further complicate that simple rule designed to advise the accused and guide law enforcement officers. Following the *Edwards* doctrine, we therefore conclude that the defendant's initiation of further conversations with police may render his confession admissible, whether or not the defendant had waived his rights under *Miranda* prior to his statement requesting counsel.[14] We conclude that when a defendant initiates contact with police, officers need not clarify a previous equivocal request for an attorney, which the officers have honored by not asking the defendant any further ques-

---

[14] The purpose behind initiation is served irrespective of whether a defendant previously waived his *Miranda* rights. "The requirement of an 'initiation' ensures that an accused has independently changed his or her mind about the need for a lawyer, and has not had his or her mind changed by the coercive pressures of continued direct questioning or its functional equivalent." *James* v. *Arizona*, 469 U.S. 990, 997, 105 S. Ct. 398, 83 L. Ed. 2d 332 (1984) (Brennan, J., dissenting from denial of certification).

tions. In these circumstances, such an inquiry would be entirely superfluous.[15]

Applying that standard to what transpired in this case, we find no violation of the letter or spirit of *Miranda* v. *Arizona*, supra, 384 U.S. 436, *Edwards* v. *Arizona*, supra, 451 U.S. 477, or our cases that apply that doctrine. The record amply supports the trial court's conclusion that the defendant initiated further conversations with police. Ruel did not question the defendant at all following his statement that he wished to call his mother because she might have called an attorney. At 9:30 p.m., Ruel and McDermott executed the search warrant and then proceeded to leave the Agawam police station. Ruel was in the parking lot getting into his car when he was summoned back to the station and told that the defendant wanted to speak with the Connecticut police. Even before the defendant told Ruel that he wanted to tell him what happened in order to get it off his chest, Ruel fully advised the defendant of his *Miranda* rights, and, as we conclude in this opinion, the trial court properly found that the defendant had waived those rights. Although the defendant's first question to Ruel, concerning what would happen to him next, was a request for information, it constituted an initiation under *Edwards* v. *Arizona*, supra, 477. In *Oregon* v. *Bradshaw*, supra, 462 U.S. 1045, the United States Supreme Court held that the defendant's question "Well, what is going to happen to me now?" was an initiation:

[15] While the defendant urges us to interpret our state constitution more expansively than the federal precedent allows, we decline to do so in this case. See *State* v. *Barrett*, 205 Conn. 437, 447, 534 A.2d 219 (1987) (state constitutional right to counsel no broader than counterpart under federal constitution). The defendant has offered no persuasive rationale for an interpretation of our state constitution to support the proposition that, although police have no duty to clarify an equivocal request for counsel by an accused who already has waived his *Miranda* rights, they do have such a duty with respect to an accused who makes an equivocal request for counsel prior to waiving those rights.

"Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." Id., 1045–46. Moreover, the defendant also stated that he wanted to tell the police what had happened and that he wanted to get something off his chest. The trial court properly concluded that the defendant had initiated further conversation with the police.

The evidence also supports the trial court's determination that the defendant waived his *Miranda* rights before giving his statement to Ruel. "The standard for waiver is that announced in *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938): 'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege . . . [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' Accord *North Carolina* v. *Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Wilson*, 183 Conn. 280, 439 A.2d 330 (1981)." *State* v. *Acquin*, supra, 187 Conn. 666–67. "[T]he state must demonstrate: (1) that the defendant understood his rights, and (2) that the defendant's course of conduct indicated that he did, in fact, waive those rights. . . . In considering the validity of [a] waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 320, 715 A.2d 1 (1998). "Although the issue is . . . ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. *State* v. *Frazier*, [185 Conn. 211, 219, 440 A.2d

916 (1981)]. *State* v. *Harris*, 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); *State* v. *Chung*, [202 Conn. 39, 48–49, 519 A.2d 1175 (1987)]; *State* v. *Wilson*, supra, 286. The burden upon the state to prove a valid waiver of *Miranda* rights is proof by a fair preponderance of the evidence and not proof beyond a reasonable doubt. *Lego* v. *Twomey*, [404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)]; *State* v. *Wilson*, supra, 287; *State* v. *Derrico*, [181 Conn. 151, 162, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]. In considering the validity of this waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver. See *State* v. *Chung*, supra, 48; *State* v. *Simms*, 201 Conn. 395, 415, 518 A.2d 35 (1986)." (Internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 48–49, 554 A.2d 263 (1989).

Our review of the evidence supports the trial court's conclusion that the defendant had waived his *Miranda* rights. The defendant was advised of his rights eight times throughout the day, and he always stated that he understood those rights. He had refused to talk to the police numerous times, indicating that he was aware of his right to remain silent. From his statements and his conduct, the trial court properly concluded that the defendant understood his rights under *Miranda*. Moreover, the defendant's conduct during his confession to Ruel illustrated that he intended to waive those rights. The defendant asked to speak with the police and again was advised of his *Miranda* rights. The defendant told Ruel that he previously did not want to talk to the police, but that he had changed his mind and now wanted to tell the officers what had happened in order to get it "off his chest." See *State* v. *Cobb*, 251 Conn. 285, 363, 743 A.2d 1 (1999) (defendant's statement that he wanted to get matter "off his chest" indicated desire to relieve his conscience by confession and was evi-

dence of waiver); *State* v. *Acquin,* supra, 187 Conn. 678 (valid waiver when defendant appeared to have psychological need to tell story). Neither threats nor physical force were used to coerce the defendant to make his statement. Id. The defendant was seated comfortably throughout the confession and he was neither handcuffed nor restrained in any manner. Considering the totality of the circumstances, the trial court properly concluded that the defendant knowingly, intelligently and voluntarily had waived his *Miranda* rights before giving his detailed confession to Ruel.

We further conclude that, even if the confession should not have been admitted at trial because of a violation of *Miranda,* any error was harmless. The improper admission of a confession is harmless error where it can be said beyond a reasonable doubt that the confession did not contribute to the conviction. *State* v. *Hoeplinger,* 206 Conn. 278, 294, 537 A.2d 1010 (1988). "This court has held in a number of cases that when there is independent 'overwhelming evidence' of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. See, e.g., *State* v. *Whitaker,* 202 Conn. 259, 272–73, 520 A.2d 1018 (1987); *State* v. *Leecan,* 198 Conn. 517, 533, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); *State* v. *Bruno,* [197 Conn. 326, 335–36, 497 A.2d 758 (1985) (*Shea, J.,* concurring)]; *State* v. *Gordon,* 185 Conn. 402, 419, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982)." *State* v. *Hoeplinger,* supra, 295.

The defendant argues that, other than his statement that he forced the victim to perform oral sex on him, there was insufficient evidence of sexual assault. The defendant also argues that, without his confession, there was little evidence of robbery or burglary. Last, the defendant claims that his confession was integral to establishing the intent to kill. Thus, he maintains, any

error in admitting the confession cannot be harmless as to his convictions. We disagree.

There was overwhelming evidence of the defendant's guilt, independent of his confession. The defendant was seen fleeing the crime scene and, when he was approached by Agawam police, he volunteered "I did it" numerous times. The defendant's blood and footprints were found at the crime scene. The victim's blood was discovered on the defendant's clothes and on the knife that was discovered in his car. The convenience store cash register was missing $83. Thus, there was ample evidence, independent of the confession, to establish that the defendant had robbed the gas station and beat the victim.

Although the examination of the victim produced no semen indicating a sexual assault, there was overwhelming evidence at the crime scene to support the state's theory that a sexual assault had occurred. The victim, employed as an attendant at a convenience store, was found naked in a back room of the store during store hours. A hair matching the defendant's pubic hair was discovered near her body. This evidence overwhelmingly supports the conviction for sexual assault, independent of the defendant's confession.

C

The defendant also argues that his confession was not knowing, intelligent and voluntary. "Irrespective of *Miranda*, and the fifth amendment itself . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . The voluntariness of a confession must be determined by the trial court as a preliminary question of fact . . . and we scrutinize the trial court's finding closely to ensure that it comports with constitutional standards of due process. *State* v. *Derrico*, [supra, 181 Conn. 163]; *State* v. *Toste*, 198 Conn. 573, 584, 504 A.2d 1036 (1986). We have stated

that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)." (Internal quotation marks omitted.) *State* v. *Shifflett, supra*, 199 Conn. 727–28. "[W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record." *State* v. *Pinder*, 250 Conn. 385, 420, 736 A.2d 857 (1999).

The defendant argues that his confession was not voluntary because, at the time of the confession, he had been awake for twenty-seven hours. During the time that he made his statement, the defendant also had an untreated stab wound. According to the defendant, his will to remain silent broke under these conditions and the pressures of interrogation. Thus, the defendant claims that his confession was not a free and voluntary act.

Our scrupulous review of the record reveals that the defendant's confession was voluntary. Ruel testified that the defendant did not appear to be sleepy while he made his statement. Prior to the confession, the defendant specifically denied that the stab wound was bothering him. The defendant was seated comfortably during the confession, and he was neither handcuffed nor restrained in any manner. At one point, the defendant asked for, and was provided with, a soda and a cigarette. There was no evidence of coercion or threats before or during the defendant's confession. Under the

totality of the circumstances, we conclude that the defendant's will to remain silent was not overborne and that his confession was voluntary.

## II

The defendant next claims that the trial court failed to obtain a waiver of his right to trial by jury with respect to the charges of felony murder arising out of sexual assault, burglary in the first degree, robbery in the first degree and sexual assault in the first degree. The following additional facts are necessary to resolve this issue.

On August 29, 1991, the defendant was charged in a short form information with capital felony for murder committed during the commission of a sexual assault in violation of § 53a-54b (7), murder in violation of § 53a-54a, and felony murder for causing a death during the course of a robbery and burglary in violation of § 53a-54c. On April 10, 1995, the defendant, in open court, waived his right to a jury trial on those charges. The trial court, *Miano, J.*, canvassed the defendant regarding his decision.[16] The court then concluded that the defendant's waiver was voluntary, intelligent and knowing.

[16] The following colloquy occurred at trial:

"The Court: Are you ready with [the defendant]?

"Mr. [Fred] DeCaprio [Defense Counsel]: Yes.

"The Court: Okay, We should have Mr. [Herbert E.] Carlson [Jr., assistant state's attorney] here. Is he available?

"Mr. Carlson: Yes.

"The Court: Oh. Bring out [the defendant], please. You're [the defendant], sir?

"The Defendant: Yes, sir.

"The Court: Okay. What's your date of birth, sir?

"The Defendant: 12/24/64.

"The Court: Okay. On the issue we talked about, whether or not there's going to be a waiver of a jury trial for the guilt phase, that was something we discussed. Mr. DeCaprio, what's your desire—your client's desire?

"Mr. DeCaprio: At this point, Your Honor, we wish to withdraw the jury election.

"The Court: For the guilt phase?

"Mr. DeCaprio: Correct.

"The Court: Okay. Sir, I am going to ask you some questions. Sir, as you know, you have a right to a jury trial, both as to a guilt phase and if you're found to be guilty, then as to a penalty phase. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay. And your lawyer has just indicated on the record that you indicated your desire to give up your right to having a jury trial in the guilt phase. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay. Now I'm just going to ask you a couple of questions and if there's something you don't understand, you feel free to interrupt me and consult with your lawyer. Now, you understand that a trial by jury is guaranteed to all citizens. That's something that is very sacred in our system. You understand that?

"The Defendant: Yes, sir.

"The Court: Okay. And before I'm going to allow somebody to give up their right to have that, I want to make sure you're doing it knowingly and intelligently and voluntarily. You understand?

"The Defendant: Yes, sir.

"The Court: Okay. Now, once you give up this right, sir, if I find that it's a knowing, intelligent waiver and you give it up, you understand that if you change your mind down the road, if you think about it, have different thoughts and ask Mr. DeCaprio—let's go see the judge; I change my mind— you understand in all likelihood, it's too late. You've given it up. You've waived it for—if it's waived today, it's waived forever, on this case, on this phase. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay. And when you have a jury trial for a crime such as yours, you have a right, by law, to have twelve citizens decide the facts of the case. That's what a jury does. They decide the facts. Do you understand that?

"The Defendant: Yes, sir.

"The Court: And in a jury trial, the jury decides what the facts are. The judge that presides there is the one that tells the jury what the law is. So, there's a separation of duties. The judge is the boss when it comes to the law in a jury trial and the jurors are the bosses when it comes to the facts in a jury trial. Do you follow that?

"The Defendant: Yes, sir.

"The Court: Okay. A lot of law students don't even follow that. And once you give up your right to have a jury trial, instead of having twelve people decide what facts have been proven to them, you're going to have just three people—three judges. Do you understand that?

"The Defendant: Yes. sir.

"The Court: Okay. And in a jury trial, the jury—any verdict the jury gives has to be unanimous regardless of what the verdict is. Whether it's guilty or not guilty, it's got to be twelve to nothing, has to render a verdict. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay, And if it's anything less than unanimous, there won't

On April 18, 1996, the state filed a long form information against the defendant, which contained the original

be a verdict. It might be a mistrial. Do you understand that, sir?

"The Defendant: Yes, sir.

"The Court: Okay. And I assume—it's unanimity also in a—oh, it's not. Majority.

"Mr. DeCaprio: No.

"Mr. Carlson: Majority.

"The Court: Okay. In a court trial, if you give up your right to having twelve people decide the case—twelve jurors—and elect to have the judges do it, you will have three judges and you understand that they do not have to be unanimous. In other words, it could be a two-to-one. Either guilty or not guilty, whichever. You understand that? It's by—

"The Defendant: Yes.

"The Court: —majority. Do you understand that?

"The Defendant: Mm-hmm.

"The Court: All right. Now, in a jury trial, the prosecutor—and let me just say this—I'm sure there may be valid reasons why one would choose to give up a right to have a jury trial. I'm sure you discussed this with your lawyer. But I just want to make you aware of this and I'm sure you are. That in a jury trial, in order to convict you where there's a jury, the prosecutor has to [convince] all twelve beyond a reasonable doubt that you're guilty of the crime charged. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay. In a court trial, they've only got to convince two out of three of your guilt. Do you understand that?

"The Defendant: Yes, sir.

"The Court: Okay. Also, another thing that should be mentioned is, I indicated to you in a jury trial, there are separate functions. The jury decides the facts. The judge decides—tells them what law they have to apply to the facts as they find them to be. In a court trial when three judges decide, the judges decide the issues of facts and the law. So, let's say—I don't know anything about your case but let's say there's something that your lawyer thinks is prejudicial. The prosecutor, let's say, wants to get it in. You don't have a jury trial now, let's assume. The judges are going to see—the three judges are going to see that which the prosecutor is claiming he wants to put into evidence and your lawyer's objecting to it. The judges are going to know what it is. Even if they say, I'm sorry, Mr. Carlson, it doesn't come into evidence—we keep it out—it's inadmissible for whatever reason—hypothetically speaking—they still have both those functions. They're supposed to keep that out of their mind and still go on with the case. Do you understand that?

"The Defendant: Yes, sir.

"The Court: In a jury trial, the jury is more—kept isolated. They wouldn't know—if there's something that's prejudicial that the state wanted to introduce or there's some objection to it—not necessarily prejudicial—and your

lawyer objected, that would be done outside the presence of the jury and if it wasn't put into evidence, it was inadmissible, the jury would never know about it. Do you understand all that?

"The Defendant: Yes, sir.

"The Court: Okay. Now, have you discussed this issue—and I'm sure you have—about giving up your right to having a jury trial—have you discussed this with Attorney DeCaprio?

"The Defendant: Yes, sir.

"The Court: All right. And have you had enough time to discuss this important waiver with him?

"The Defendant: Yes, sir.

"The Court: Okay. And are you satisfied with the advice he's given you?

"The Defendant: Yes, sir.

"The Court: All right. And how old are you, sir?

"The Defendant: Thirty.

"The Court: And how much formal schooling have you had?

"The Defendant: Tenth grade.

"The Court: All right. Is there any question you have of me about your giving up of this right?

"The Defendant: No, sir.

"The Court: Is there anything I've said that you do not understand?

"The Defendant: No, sir.

"The Court: Okay. Any other questions you want to suggest, either party, to the court?

"Mr. Carlson: Mr. DeCaprio?

"The Court: Mr. DeCaprio?

"Mr. DeCaprio: I don't know that it's been made absolutely obvious, Your Honor. Perhaps, just the inquiry about voluntariness, threats or promises or anything like that.

"The Court: Okay. Anybody threaten you to induce you to waive this right?

"The Defendant: No.

"The Court: Has anybody promised you anything at all?

"The Defendant: No, sir.

"The Court: To get you to waive this right?

"The Defendant: No, sir.

"The Court: All right. Do you have any suggestions?

"Mr. Carlson: Yes, Your Honor. Certainly, it's well said that Your Honor has inquired about the separate functions because there will be a motion to suppress in this case of the statement. So, that's a reality. So, I'm glad that you mentioned that and I'm sure Mr. DeCaprio fully discussed that anyway. Also, one thing that I would suggest that Your Honor mentions is that in a three-judge panel, the judges are selected by the Chief Court Administrator. Whereas, in a jury case, the jurors are selected by the parties and so, there's a difference there.

"The Court: All right. Did you hear that? Did you follow that?

"The Defendant: Yes, sir. I understand that.

"The Court: In a jury case, you will have input with your lawyer and the

charges and added four other counts: felony murder arising out of sexual assault in violation of § 53a-54c, burglary in the first degree in violation of § 53a-101 (a) (1) and (2), robbery in the first degree in violation of § 53a-134 (a) (1) and (3), and sexual assault in the first degree in violation of § 53a-70 (a). On June 4, 1996, prior to the beginning of the presentation of evidence, the defendant appeared before the trial court, *Barry, J.*, and pleaded not guilty to all the charges in the April 18, 1996 information. The defendant also repeated his election to be tried by a three judge panel.[17]

prosecutor, too, in picking the jurors, the judges of the facts. All right? In a court trial, I'm going to make a request to the Chief Court Administrator that he picks the judges. So, you will have no input on that. Do you understand that, sir?

"The Defendant: Yes, sir.

"The Court: All right. After hearing everything I've said, do you still want to give up your right to having a jury trial on the guilt phase of your case?

"The Defendant: Yes, sir.

"The Court: All right. Counsel, do you have any reason why I shouldn't find a knowing, intelligent and voluntary waiver?

"Mr. DeCaprio: No, Your Honor.

"The Court: State?

"Mr. Carlson: The canvass is complete, as far as I'm concerned.

"The Court: All right. Thank you, sir. The court makes a finding that the gentleman made a—tendered a knowing, intelligent and voluntary waiver of his right to have a trial by jury. I'm sure he's satisfied of the import of it and I'm confident there's been effective assistan[ce] of counsel and I'm going to find a waiver to a jury trial on the first phase."

[17] The following colloquy occurred at that time:

"Judge [David M.] Barry: The record will reflect the presence of the defendant . . . . The defense has had an opportunity, I assume, to go over the information dated April 18, 1996 with [the defendant]?

"Mr. [Barry] Butler [Defense Counsel]: That's correct, Your Honor.

"Judge Barry: Is he prepared to go to plea at this time on this information?

"Mr. Butler: Yes, Your Honor.

"Judge Barry: And you wish the reading of the information?

"Mr. Butler: We'll waive the full reading.

"Judge Barry: All right. How do you plead?

"The Defendant: Not guilty, Your Honor.

"Mr. Butler: Plead not guilty to all counts, Your Honor.

"Judge Barry: And how do you elect to be tried?

"Mr. Butler: Three judge panel I would assume, Your Honor, before the court.

On appeal, the defendant claims that, as to the four additional charges, he never knowingly waived his right to a jury trial. Although the defendant does not contest the adequacy of the trial court's April 10, 1995 canvass before his waiver of a jury trial, he claims that, because of the added charges, a supplemental canvass on his waiver of a jury trial was required. Because the defendant did not preserve this claim at trial, he urges us to review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), where we established a framework for reviewing unpreserved claims of constitutional error. Such a claim succeeds "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id. The first two steps in the *Golding* analysis address the reviewability of the claim, and the last two steps involve the merits of the claim.

We recognize that the record is adequate for review of the defendant's claim, and that the defendant's right to a jury trial is clearly of constitutional magnitude. See U.S. Const., art. III; Conn. Const., art. I, §§ 8 and 19. The defendant's claim fails *Golding*'s third prong, however, because we conclude that, on June 4, 1996, the defen-

---

"Judge Barry: And my recollection of this is that his right to a—he previously waived his right to a jury trial before Judge Miano, is that correct?

"Ms. [Karen] Goodrow [Defense Counsel]: As to the guilt phase only, Your Honor.

"Judge Barry: Yes, as to the guilt phase only. Okay. All right. Plea of not guilty may enter to each of these six counts in the information dated April 18, 1996, with the election as stated."

dant knowingly and intelligently waived a jury trial as to all the crimes in the April 18, 1996 information. As the transcript of June 4, 1996, reveals, the defendant was at all times represented by counsel, who announced the waiver of a jury trial in the defendant's presence. The judge and counsel then referred to the defendant's previous election waiving a jury trial, and the defendant made the same election as to all charges. In these circumstances, the defendant's argument is without merit. See *State* v. *Marino*, 190 Conn. 639, 645, 462 A.2d 1021 (1983) ("[i]t is not unreasonable to infer such a waiver from the free expression by a defendant of his election of a non-jury trial especially where he is represented by counsel").

## III

The defendant next claims that the trial court lacked jurisdiction over the charge of felony murder based on a predicate felony of sexual assault in the first degree because probable cause was never found as to that charge, as required by General Statutes § 54-46a.[18] The following additional facts are relevant to this claim on appeal.

On August 29, 1991, the trial court, *Damiani, J.*, held a probable cause hearing to determine whether probable cause existed to prosecute the defendant for capital felony arising out of sexual assault, murder, and felony murder arising out of robbery and burglary. At the end of that hearing, the trial court concluded that probable cause existed for the prosecution of those crimes. On April 18, 1996, the state filed a substitute

---

[18] General Statutes § 54-46a (a) provides in relevant part: "No person charged by the state . . . shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause."

information adding to the pending charges felony murder based on sexual assault, sexual assault in the first degree, robbery in the first degree and burglary in the first degree. On May 31, 1996, the defendant filed a motion to dismiss the added charges of sexual assault and felony murder based on sexual assault, claiming that probable cause had not been found for these crimes. Immediately before the trial began, the panel denied the motion, concluding that "[i]t would serve no useful purpose for—this requirement of probable cause or request for probable cause hearing to be referred to another court for determination of the facts and entry of a finding."

On appeal, the defendant argues that the trial court did not have jurisdiction to try the defendant for felony murder arising out of sexual assault because there was never a finding of probable cause.[19] The state counters that, in finding probable cause for capital felony arising out of sexual assault, the trial court also found probable cause for the charge of felony murder arising out of a sexual assault. We agree with the state.

The defendant argues that the trial court did not find probable cause for this specification of felony murder, because felony murder occurs when the murder is committed "in the course of and in furtherance of" a sexual assault, whereas capital felony is a murder committed "in the course of the commission of" sexual assault. He concludes that, because felony murder must be committed "in furtherance of" a felony, the sexual assault felony murder is not a lesser included offense of the capital felony. We have held, however, that the terms "in the course of" and "in furtherance of" a felony may be combined to mean "in the natural progression of" the felony. *State* v. *Young*, 191 Conn. 636, 640 n.5, 469

---

[19] The defendant has not appealed from the trial court's denial of his motion with respect to the charge of sexual assault in the first degree.

A.2d 1189 (1983). We have also approved defining the combined terms to mean "as a result of" the felony. *State* v. *MacFarlane*, 188 Conn. 542, 551–52, 450 A.2d 374 (1982). We conclude that the language "in the course of the commission of a sexual assault," as used in the capital felony statute, has the same meaning as "in the course of and in furtherance of," as used in the felony murder statute. Such a reading of the phrase in the capital felony statute is the only reasonable reading of that most serious penal statute. We cannot conclude that the legislature intended to require a causal as well as a temporal connection between the homicide and the sexual assault in order to convict for a class A felony, punishable by jail time, but intended to require only a temporal connection between the sexual assault and the homicide in order to impose the death penalty. Because felony murder arising out of sexual assault in this case is a lesser included offense of this capital felony, in finding probable cause for capital felony arising out of sexual assault, the trial court found probable cause for the prosecution of felony murder. We therefore reject the defendant's claim that the trial court lacked jurisdiction over this charge.

## IV

The defendant also asserts that there was: (1) insufficient evidence to support the trial court's finding of probable cause that the defendant committed burglary, as a predicate to the felony murder charge; and (2) insufficient evidence to support his convictions of burglary and felony murder predicated on burglary.[20] We reject both of the defendant's claims.

---

[20] Under General Statutes § 53a-101 (a), "[a] person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

## A

At the probable cause hearing, the state argued that there existed probable cause that the defendant committed burglary because the rear utility room in which the defendant had sexually assaulted and murdered the victim was a "building" that was not open to the public. As evidence, the state presented the floor plan of the gas station and photographs of its interior. These exhibits and the testimony at the hearing illustrated that the convenience store, which occupies a small portion of the gas station building, is the only area open to the public. From the store, a door leads to the former three automobile bay area of the garage, which is not open to the public. At one end of the three bay area is an office, and at the other end is a rear utility room. Neither room is open to the public, and at the door leading into the rear utility room, a sign reads, "Private, Employees Only." The trial court, *Damiani, J.*, found that probable cause existed to charge the defendant with felony murder arising out of burglary.

The defendant argues that there was insufficient evidence to support the trial court's finding that probable cause existed. The defendant concedes that he failed to raise this claim at the probable cause hearing by objecting or moving for acquittal. He asserts that review under *Golding* is appropriate because: (1) the record is adequate for review; and (2) the requirement of probable cause is jurisdictional and therefore constitutional in nature. The state counters that the defendant waived this argument when he failed to object to the state's argument or move for acquittal at the hearing. We agree with the state, and we decline to review this claim on appeal.

The defendant correctly asserts that a finding of probable cause is necessary to establish that a court has jurisdiction to try a suspect as to a certain charge. See

*State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986). As we stated in *State* v. *John*, 210 Conn. 652, 665 n.8, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), however, "our reference in *State* v. *Mitchell*, [supra, 330], to a determination of probable cause as a prerequisite to subsequent jurisdiction to hear the trial pertains, not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant. General Statutes § 54-46a (a) expressly allows the waiver of a preliminary hearing to determine probable cause, so it obviously cannot be essential for subject matter jurisdiction. Accordingly, like other defects relating to jurisdiction of the person, any infirmity in the evidence presented at a probable cause hearing is deemed to be waived if not seasonably raised. *State* v. *Baez*, 194 Conn. 612, 615–16, 484 A.2d 236 (1984); *State* v. *Gallagher*, 191 Conn. 433, 438, 465 A.2d 323 (1983)." (Internal quotation marks omitted.) Therefore, because the defendant neither countered the state's argument at the probable cause hearing, nor moved for acquittal based on insufficient evidence, we conclude that the defendant waived his right to contest the sufficiency of the evidence at the probable cause hearing.

B

The defendant also claims that there was insufficient evidence at trial to support his conviction for burglary and felony murder based on burglary. At trial, the state presented as evidence the floor plan and photographs of the gas station, to show that the rear utility room was a separate "building" from the convenience store. At the close of the evidence, the state argued that, because the utility room was off-limits to the public, the defendant committed burglary when he entered that room with the intent to commit a crime. The three judge panel found the defendant guilty of burglary under two theories: (1) that the defendant, armed with a dangerous

instrument, intentionally and unlawfully entered the gas station with the intent to commit a robbery, and that while in the building the defendant intentionally and knowingly inflicted multiple bodily injuries upon the victim; and (2) that the defendant, armed with a dangerous instrument, intentionally and unlawfully entered the back room of the gas station building with intent to commit a sexual assault, and that while in the back room the defendant intentionally and knowingly inflicted multiple bodily injuries upon the victim.

The defendant argues that the trial court's first finding, namely, that entering the gas station with the intent to commit a crime constituted burglary, is not supported by the evidence because the defendant did not "unlawfully enter" the gas station proper, which was open to the public. See General Statutes § 53a-100 (b) ("[a] person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are *not open to the public* and when the actor is not otherwise licensed or privileged to do so" [emphasis added]). The state concedes that the trial court's conclusion in this respect was incorrect.

The defendant also claims that the trial court's second finding, namely, that entering the rear utility room with the intent to commit a crime constituted burglary, is not supported by the evidence because the rear utility room was not a "building" under our statute. The state counters that the rear utility room was a "building" because it was a separate unit. We agree with the state.

General Statutes § 53a-100 (a) (1) defines "building" to include, "in addition to its ordinary meaning . . . any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy. Where a building consists of separate units, such as, but not limited to separate apartments, offices or rented rooms, any unit not

occupied by the actor is, in addition to being a part of such building, a separate building . . . ." In *State* v. *Cochran*, 191 Conn. 180, 184–86, 463 A.2d 618 (1983), we held that, although the defendant had been invited into a house by one of its occupants, his entry into the locked bedroom of another occupant with the intent to steal constituted a burglary. The bedroom was a separate unit to which the defendant's license to enter the home did not extend. Id., 185.

In *State* v. *Thomas*, 210 Conn. 199, 205–206, 554 A.2d 1048 (1989), however, we reversed the defendant's burglary conviction, holding that the area behind the counter at a convenience store was not a "building." We stated that "[t]he store counter, and the area it encompasses, clearly does not fall within the separate unit category of offices, rooms or like structures that may themselves be considered separate building[s] under § 53a-100 (a) (1) . . . ." (Internal quotation marks omitted.) Id., 206. Similarly, in *State* v. *Russell*, 218 Conn. 273, 280, 588 A.2d 1376 (1991), we reversed the defendant's burglary conviction, holding that an area of a grocery store that carried merchandise with a high value and was locked and enclosed by an eight foot tall metal folding gate during the hours of 9 p.m. to 9 a.m. was not a building separate from the rest of the grocery store, which was open to the public twenty-four hours a day. We stated that "[u]nlike an office building, where numerous independent working enterprises coexist, the Pathmark grocery store houses a single working unit. The temporarily enclosed service area, analogous to a locked closet or a locked storage room, has no business purpose or occupancy distinct from that of the Pathmark store as a whole." Id., 279.

In light of this precedent and the evidence presented at the trial, we conclude that the trial court reasonably could have determined that the rear utility room was a separate unit and, therefore, a "building" under our

statute. The utility room was a separate room, structurally distinct from the convenience store. It was not visible from outside the gas station or from the store area of the structure, and could be reached only through the gas station's three bay garage area, which was not open to the public. The words "Private, Employees Only" were painted on the door of the rear utility room, which housed circuit breakers, mops, a ladder, a sink, shelves for storage and a wooden desk. The utility room had a different business purpose from the convenience store, as merchandise was not sold from this room and the public never was invited to enter it. In fact, the evidence illustrated that a large part of the gas station structure was not open to the public, and the convenience store, to which the public had access, occupied a very small portion of the structure. Under these circumstances, the three judge panel reasonably could have concluded that the rear utility room was a legally identifiable separate unit from the convenience store, and, therefore, a separate "building" under our statute.

The defendant claims that the language in *State* v. *Russell*, supra, 218 Conn. 279, mandates a different result. We disagree. In *Russell*, the service area was not a separate room at all; it was part of the store and was used for selling merchandise during a large part of the day. The area was not structurally distinct, like a separate room with walls and a door. To the daytime shopper, the area was not identifiable as a separate entity, but was merely part of the grocery store. The area was "temporarily enclosed" during the evening hours for safety purposes, but this did not change the fact that the area's business purpose was to sell merchandise. In contrast, the rear utility room in this case was a separate room, with a separate business purpose, namely, storage and employee use, and merchandise never was displayed or sold from this area. This structurally distinct room, which could be accessed only

by traveling through the three bay garage area, was a separate unit and constituted a "building" under our statutes.[21]

On these facts, we conclude that there was sufficient evidence to support the trial court's conclusion that the defendant committed burglary in the first degree. Thus, we affirm the defendant's convictions for burglary and felony murder predicated on burglary.

V

The defendant's final claim is that the trial court should not have admitted his confession that he had sexually assaulted the victim before murdering her because the confession was inadmissible under the corpus delicti rule. We disagree.

At the beginning of the trial, the defendant filed a motion to exclude the portion of his statement in which he claimed to have sexually assaulted the victim. The defendant argued that there was no corroborating evidence that a sexual assault had occurred, and, therefore, the corpus delicti rule of State v. Tillman, 152 Conn. 15, 202 A.2d 494 (1964), barred the admission of his statement that he had forced the victim to perform oral sex on him. The three judge panel deferred decision on this motion until the completion of the evidence. At that time, the panel denied the motion, stating: "With respect to the defendant's motion to exclude portions of [the] statement of the defendant from evidence, that motion being dated June 4, 1996, the court, pursuant to the holding in State v. Harris, 215 Conn. 189 [575

---

[21] The defendant claims that Russell's analogy of the service area to a "locked closet or a locked storage room" mandates that we reverse his burglary conviction. State v. Russell, supra, 218 Conn. 279. The language on which the defendant relies was dicta and is not binding on us now. Moreover, we do not find the claimed analogy relevant to this case because the evidence indicated that the rear utility room was not a "locked closet or locked storage room."

A.2d 223 (1990)], finds that sufficient independent evidence has been introduced that tends to corroborate and establish that the defendant's written confession, dated July 14, 1991, is trustworthy. The court specifically refers to the fact that the victim's body was found naked except for sneakers and socks. And further, that a pubic hair similar to the defendant's was found on the victim's blouse. Accordingly, this motion is denied."

On appeal, the defendant argues that the trial court, in citing *State* v. *Harris*, supra, 215 Conn. 189, applied the wrong standard in admitting his statement. The defendant argues that *State* v. *Tillman*, supra, 152 Conn. 15, establishes the corpus delicti rule for crimes that result in a certain injury or loss, and that the rule of *State* v. *Harris*, supra, 215 Conn. 189, applies only to those crimes that prohibit conduct but do not result in an injury or loss. The defendant argues that, under the *Tillman* standard, the state did not proffer sufficient evidence, independent of the confession, that a sexual assault had occurred because there was no physical evidence of sexual trauma or sexual intercourse.

Before *State* v. *Tillman*, supra, 152 Conn. 15, the corpus delicti law of this state required that, in order to admit a confession into evidence, the state had to demonstrate through extrinsic evidence that the crime charged had been committed. See *State* v. *Doucette*, 147 Conn. 95, 99, 157 A.2d 487 (1959); *State* v. *LaLouche*, 116 Conn. 691, 694, 166 A. 252 (1933). *State* v. *Tillman*, supra, 20, changed this rule, holding that "the corpus delicti consists of the occurrence of the *specific kind of loss or injury* embraced by the crime charged. . . . [Thus] in a homicide case, the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered." (Emphasis added.)

In *State* v. *Harris*, supra, 215 Conn. 193, we recognized that it may be impossible to apply the *Tillman*

corpus delicti rule to offenses that prohibit conduct, but that do not create any loss or injury.[22] "Therefore, when the crime charged prohibits certain conduct but does not encompass a specific harm, loss or injury, a different approach to the corpus delicti rule, other than that enunciated in *Tillman*, is required. We conclude that the most reasonable approach is that stated in *Opper* v. *United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 (1954), wherein the court said: '[W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is [only] necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish *the trustworthiness of the [defendant's] statement.*' " (Emphasis added.) *State* v. *Harris*, supra, 193–94. The court continued by noting that the *Opper* "rule concerning the corroboration required for the admission into evidence of postcrime statements of an accused is uncomplicated and workable. It will eliminate the complexities and difficulties attendant upon the application of the corpus delicti rule requiring independent corroborating evidence of all the elements of a crime before an accused's statements may be admitted into evidence. . . . *It is also adaptable to any conduct crime and is more in harmony with the spirit of Tillman than the traditional corpus delicti rule.* . . . Yet, at the same time, it will fulfill the 'avowed purpose and reason' for the existence of the corpus delicti rule and protect accused persons against conviction of offenses that have not in fact occurred . . . and prevent 'errors in convictions based upon untrue confessions alone.' " (Citations omitted; emphasis added.) Id., 195–96.

---

[22] At issue in *Harris* was the defendant's confession that he was driving under the influence of alcohol when he crashed his car into a tree. Under the *Tillman* rule, the confession would have been inadmissible because there were no eyewitnesses who could testify that the defendant actually was driving the car under the influence of alcohol prior to the accident.

A number of commentators have stated that the "trustworthiness" rule adopted by *Opper* and *Harris* is the "best approach" for admitting confessions. C. McCormick, Evidence (3d Ed. 1984) § 145, p. 371; see also 7 J. Wigmore, Evidence (4th Ed. 1978) § 2071, p. 511 ("the [corpus delicti] rule is properly not limited to evidence concerning the corpus delicti; thus the corroborating facts may be of *any sort whatever*, provided only that they tend to produce a confidence in the truth of the confession" [emphasis in original]); 29A Am. Jur. 2d 116, Evidence § 753 (1994) ("trustworthiness doctrine has been adopted as the 'best rule' "). Many courts also have adopted this view. See *Smith* v. *United States*, 348 U.S. 147, 156, 75 S. Ct. 194, 99 L. Ed. 192 (1954) ("it is sufficient if the corroboration merely fortifies the truth of the confession without independently establishing the crime charged"); *Government of Virgin Islands* v. *Harris*, 938 F.2d 401, 409–10 (3d Cir. 1991) (trustworthiness doctrine is best rule); *United States* v. *Kerley*, 838 F.2d 932, 940 (7th Cir. 1988) ("corpus delicti rule no longer exists in the federal system"); *State* v. *Yoshida*, 44 Hawaii 352, 357–58, 354 P.2d 986 (1960) (adopting trustworthiness rule); *State* v. *Parker*, 315 N.C. 222, 235–36, 337 S.E.2d 487 (1985) (same). Following these authorities, we conclude that the trustworthiness formulation adopted in *Harris* applies to all types of crimes, not only those offenses that prohibit conduct and do not result in a specific loss or injury.[23]

We also conclude that the trial court properly determined that the corpus delicti had been established in this case. As we have determined previously, there was ample evidence, independent of the confession, that the defendant sexually assaulted the victim. Her badly

---

[23] We note, however, that proving the trustworthiness of a defendant's confession to a crime resulting in injury or loss often will require evidence of that injury or loss. For example, a confession to a homicide likely would not be trustworthy without evidence of the victim's death.

beaten body was found naked except for her shoes and socks, during business hours, in the rear of the convenience store where she was employed as an attendant. A pubic hair discovered on the victim's blouse had microscopic characteristics similar to the defendant's pubic hair. The lack of any evidence of trauma to the victim's genitalia or samples of semen at the crime scene or on her body does not establish that no sexual assault occurred.[24] See *State* v. *Arnold*, 201 Conn. 276, 286, 514 A.2d 330 (1986). Rather, the lack of physical evidence of sexual trauma or ejaculation here supports the trustworthiness of the defendant's confession. In that confession, he admitted that he demanded oral sex, stated that he could not maintain his erection and did not ejaculate during the assault. We reject the defendant's contention that there was an insufficient basis to admit his statement that he had sexually assaulted the victim.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[24] Under the definition of "sexual intercourse" in General Statutes § 53a-65 (2), "[p]enetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. . . ."